Jahan C. Sagafi (Cal. Bar No. 227887)
jsagafi@outtengolden.com
Julia Rabinovich (Cal. Bar No. 290730)
jrabinovich@outtengolden.com
Relic Sun (Cal. Bar No. 306701)
rsun@outtengolden.com
OUTTEN & GOLDEN LLP
One Embarcadero Center, 38th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile: (415) 638-8810

Rachel M. Bien (*pro hac vice* motion forthcoming)
rmb@outtengolden.com
OUTTEN & GOLDEN LLP
3 Park Avenue, 29th Floor
New York, NY 10016
Telephone: (212) 245-1000
Facsimile: (646) 509-2060

*Counsel for Plaintiffs, Aggrieved Employees, and Proposed Class Members*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ALEX ZAMORA and RAYSHON CLARK on behalf of themselves and all those similarly situated, | Case No. |
| | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW AND COMMON LAWS;** |
| Plaintiffs | |
| v. | **CLAIMS FOR DAMAGES AND INJUNCTIVE RELIEF;** |
| LYFT, INC., | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiffs Alex Zamora and Rayshon Clark ("Plaintiffs") allege, on behalf of themselves and all those similarly situated, as follows:

## JURISDICTION AND VENUE

1.      This Court has original jurisdiction over all claims pursuant to 28 U.S.C. § 1332(d), because this case is a class action involving more than 100 class members; the amount in controversy exceeds $5,000,000, exclusive of interest and costs; and at least some members of the proposed class have different citizenship from the defendant, Lyft, Inc. ("Lyft" or "Defendant").  *See* 28 U.S.C. § 1332 (d); *Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1021 (9th Cir. 2007).

2.      The United States District Court for the Northern District of California has personal jurisdiction over Defendant because Lyft's principal place of business is in this District and many of the acts complained of and giving rise to the claims alleged took place in California and in this District.

3.      Venue is proper in either the San Francisco or Oakland Divisions of this District pursuant to 28 U.S.C. §§ 1391(b), (c)(2) and Civil L.R. 3-2(d) because Defendant resides in San Francisco and a substantial part of the events giving rise to the claims occurred and/or emanated from there.

4.      This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## SUMMARY OF CLAIMS

5.      Plaintiffs are current drivers for Lyft ("Drivers").  They bring this class action on behalf of themselves and all others similarly situated.

6.      Plaintiffs allege that Lyft maintains an unlawful policy and practice of taking a portion of the money that Lyft passengers ("Riders") pay pursuant to Lyft's "Prime Time" premium pricing policies, even though Lyft has consistently claimed that 100% of the Prime Time Premiums go to the Drivers.  Specifically, during periods of high Rider demand relative to Driver supply (called "Prime Time"), Lyft charges Riders a premium (the "Prime Time

Premium"), which is an amount above the base price for a ride.  Although its marketing of the Prime Time Premium has evolved over time, Lyft has consistently communicated to each Rider that the Prime Time Premium will be paid wholly to the Driver.  In reality, Lyft has taken a portion of the Prime Time Premiums for itself.

       7.     Plaintiffs allege that this practice is unlawful in two ways.

       a.     <u>First</u>, this practice constitutes an unlawful taking of an employee's gratuities.  Because Lyft should have classified the Drivers as employees, not independent contractors, the Drivers are entitled to keep gratuities paid to them by customers (the Riders).  This claim is brought under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL") (based on its unlawfulness as a violation of Cal. Labor Code § 351, its unfairness, and its fraudulent nature) and the California Private Attorneys General Act, Cal. Labor Code §§ 2698-2699.5 ("PAGA") (based on its unlawfulness as a violation of Cal. Labor Code § 351) on behalf of all Drivers in California.

       b.     <u>Second</u>, this practice violates Drivers' statutory and common law rights.  This set of claims is brought under the UCL claims and common law (conversion, breach of contract, and tortious interference with prospective economic advantage) on behalf of all Drivers in the United States.

       8.     Through their classwide claims, Plaintiffs seek repayment of all portions of the Prime Time premiums unlawfully taken by Lyft; restitution and/or disgorgement of all profits obtained by Lyft from its unlawful and unfair business practices; all penalties and other damages permitted by law; injunctive and declaratory relief; all other forms of equitable relief permitted by law; reasonable attorneys' fees and costs; and service payments for the Class Representatives.

## **RELATED CASES**

       9.     Two related cases against Lyft are currently pending.

       a.     One case, *Cotter v. Lyft, Inc.,* No. 3:13-cv-04065-VC (N.D. Cal.), focuses on mileage reimbursement, overtime, and gratuity claims on behalf of Drivers against Lyft.  The gratuity claims in *Cotter* do not overlap with those asserted herein.  Specifically, the

Class Action Complaint

*Cotter* gratuity claims appear to focus on the limited period in 2013[1] when Lyft's pricing model provided that Riders were not charged a price for their rides, but were invited to pay a recommended donation to the Drivers. Cotter's theory is that when Riders chose to pay an amount greater than the recommended donation, that excess amount was a gratuity that, under Cal. Labor Code § 351, should have been given wholly to the Driver, when in reality Lyft took a portion of that amount for itself. This gratuity theory is referred to herein as the "*Cotter* Gratuity Theory."

b.     The other case, *Price v. Lyft, Inc.*, No. BC548636 (Los Angeles Superior Court), appears to involve substantially the same claims and theories as *Cotter*.

10.     *Cotter* and *Price* are distinct from this action because the *Cotter* Gratuity Theory only applies to a particular criticism of a particular aspect of the recommended donation pricing model, whereas the claims asserted herein are premised on a different criticism of a different pricing model (the Prime Time Premium pricing).

## SUMMARY OF CLASS ACTION ALLEGATIONS

11.     The California Class.  Plaintiffs bring this action on behalf of all Lyft Drivers in California from the date Lyft began taking a portion of Prime Time payments through the date of the final disposition of this action (the "California Class Period").  On behalf of the California Class, Plaintiffs assert claims of unlawful business practices under the UCL and the California Private Attorneys General Act, Cal. Labor Code §§ 2698-2699.5 ("PAGA").

12.     The Nationwide Class.  Plaintiffs also bring this action on behalf of all Lyft Drivers in the United States from the date Lyft began taking a portion of Prime Time payments through the date of the final disposition of this action (the "Nationwide Class Period").  On behalf of the Nationwide Class, Plaintiffs assert claims of unfair business practices under the UCL; conversion; third party beneficiary breach of contract; and tortious interference with prospective economic advantage.

---

[1] This practice lasted from January 14, 2013 to December 23, 2013.  *See Cotter*, ECF No. 169-2 at 8.

**THE PARTIES**

13.     Plaintiff <u>Alex Zamora</u> is a resident of Oakland, California.  Mr. Zamora has worked as a Lyft Driver from approximately March 2015 to the present in the San Francisco Bay Area.  During this time, Mr. Zamora has worked approximately 20 to 30 hours per week.  He has given many rides covered by the Prime Time Premium pricing model.  Mr. Zamora's precise hours, pay, and revenue generated for Lyft pursuant to its Prime Time Premium model are available by reference to Lyft's records.

14.     Plaintiff <u>Rayshon Clark</u> is a resident of Benicia, California.  Mr. Clark has worked as a Lyft Driver from approximately December 28, 2015 to the present in the San Francisco Bay Area.  During this time, Mr. Clark has often worked approximately 30 to 50 hours per week as a Lyft driver.  He has given many rides covered by the Prime Time Premium pricing model.  Mr. Clark's precise hours, pay, and revenue generated for Lyft pursuant to its Prime Time Premium model are available by reference to Lyft's records.

15.     Defendant <u>Lyft, Inc</u>. is a Delaware corporation with its corporate headquarters and primary place of business in San Francisco, California, and operations in at least 33 other states in the United States.  The practices described in this Complaint were designed at, emanated from, and carried out by agents in Lyft's San Francisco, California headquarters.

**FACTUAL BACKGROUND**

16.     Lyft is a "ridesharing"[2] business that originated in San Francisco, California, in 2012 and portrays itself – in contrast to its powerful competitor, Uber – as an egalitarian, community-minded company with friendly drivers whom Lyft values more and treats better than the drivers at Uber.  In keeping with this image, Lyft touts its claim that Lyft drivers, unlike Uber drivers, always receive 100% of all tips left for them by Riders.

---

[2] Lyft provides Riders with transportation by connecting them with Lyft Drivers through a mobile phone application (the "Lyft App").  The Driver then transports the Rider, and Rider pays Lyft for the service with a credit card via the Lyft App.  The Lyft App sets the fare to be paid by the Rider. A Rider may tip the Driver by designating an amount in the Lyft App.  Lyft then pays the Driver 80% of the ride fare plus 100% of any added tip.  Lyft keeps 20% of the fare for itself.

**Lyft Invents Prime Time Premiums.**

17.     Lyft's Prime Time Premium pricing, akin to Uber's "surge" pricing, is a program whereby Lyft charges Riders a premium for rides during times of high Rider demand relative to Driver supply.  The history of this program can be broken down into three phases.

18.     During <u>Phase One</u>, beginning in approximately December 2013, Lyft invented and implemented Prime Time Premium pricing as "Prime Time Tips."  When Lyft announced the Prime Time Premium in November 2013, it assured the public generally, and Riders and Drivers specifically, that 100% of the Prime Time Tip would be kept by Drivers, and Lyft would take none for itself.

19.     An article heralding the launch of Prime Time Tips, found at https://pando.com/2013/11/22/lyft-introduces-uber-style-surge-pricing-urges-us-not-to-call-it-that/, explained:  "Perhaps most importantly, the drivers will keep all the extra money, unlike Uber, where the company scarfs down a 20 percent cut."  The article quoted Lyft President John Zimmer:  "'It's different – it's the Lyft way of doing things,' Zimmer says.  'We wanted to make sure our incentives were aligned with every member of the community:  Drivers and passengers.'"

20.     The article focused on the difference in ethos between Lyft (more "egalitarian," and "all about community, casualness, and letting the good times ride") and Uber (more "capitalistic" and "all about seriousness").  The article opened by noting: "Uber and Lyft have long been polar opposites in the urban transportation wars."  The article quoted a Lyft investor as emphasizing the "special Lyft quality" of Prime Time Tips.

21.     In conclusion, the article summarized the main competitive advantage of Lyft's Prime Time Tips over Uber's surge pricing, explaining that "[t]he key to communicating the difference in Lyft's approach to surge pricing" is "simple":  "Lyft drivers keep all the extra money from Prime Time Tips.  Because no matter how close these companies veer towards one another, Uber will never be able to resist taking its cut."

22.     In an article a month later, the same author corrected some misconceptions from the earlier article, but reiterated in the opening lines that the fact that Lyft drivers would

- 5 -

retain 100% of the Prime Time Tips income was correct.  In short, the number one difference between Uber's surge pricing and Lyft's Prime Time Tips was this:  "Unlike Uber which takes a 20 percent cut, Lyft won't keep any of the money from Prime Time Tips.  It will all go to the drivers themselves."  Lyft President Zimmer confirmed:  "No matter what, we'll always have the most affordable ride because we're not taking any amount from that [Prime Time] increase."

23.     In communicating Prime Time Tips to Riders, the Lyft explained that "[t]he tip goes entirely to your driver," through the Lyft App's display of the following image as each Rider confirmed a request for a Driver:



24.     During Phase Two, beginning in approximately August 2014, Lyft began taking 20% of the Prime Time Tips collected from Riders, even though it continued to describe the Prime Time Tips as "tips."  When Riders agreed to initiate a Lyft ride during Prime Time, they clicked on a confirmation screen that stated that the Prime Time increase was a "tip" that was "for the driver."

25.     During Phase Three, beginning sometime after August 2015 (and continuing to the present), Lyft changed the name of "Prime Time Tips" to simply "Prime Time," but continued to inform Riders that the additional charge was "for the driver" and continued to take 20%[3] of the Prime Time Premium.[4]  The Lyft App displays the following message to the Rider as she confirms her request for a Driver.

---

[3] In New York City, this portion is 34.6%, instead of 20%.  Lyft also began taking a 25% portion of rides provided by drivers who began working for Lyft after January 2016.  For simplicity's



26.  Legally, this Prime Time Premium is either (1) a tip for an employee Driver or (2) a promise to the customer that the independent contractor Driver will receive the entire amount of the premium (akin to a tip, but for an independent contractor), leading the customer to believe that an additional tip is not necessary.

**Lyft's Drivers Are Misclassified As Independent Contractors And Should Be Classified As Employees.**

27.  <u>Drivers Are Central to Lyft's Business</u>.  Lyft Drivers are the face of Lyft. Drivers provide the service that Lyft sells to the public.  Drivers are encouraged to be friendly and fun and professional.  Their dedication and effort has created Lyft's reputation as a company that is friendlier than its rival, Uber.  Lyft rewards Drivers for what it deems great performance and punishes Drivers for what it deems poor performance.

28.  Lyft earns money by providing its customers with a ride from point A to point B – a service that is wholly dependent on Drivers.  Drivers are also literally the face of the company and their interactions with Riders create the experience that Lyft promotes as more friendly and satisfying than the service Uber provides.

29.  As part of Lyft's requirements, Drivers must receive training in how to interact with Riders and Lyft pairs Drivers with mentors who further educate them about Lyft expectations and practices.  Lyft Drivers must pass criminal background and driving record checks and can be fired if, for any reason, Lyft decides that the Driver has not behaved

_____

sake, the 20% figure is used herein even though 34.6% applies in New York City and 25% applies to new drivers.
[4] Separately, after the ride is over, Riders are able to pay a tip, which goes 100% to the Driver.

appropriately; this includes failing to accept rides or receiving a low rating from a Rider, whether warranted or not.

30.    <u>Drivers Lack Business Autonomy</u>.  Drivers cannot provide their transportation services without the Lyft App.  Lyft prohibits Drivers from setting or in any way affecting the rates of pay for their own services.  Lyft also prohibits Drivers from communicating with Riders about future ride services.  Drivers are dependent on Lyft to identify Riders for them and may not hire employees to assist them in providing services for Lyft.

31.    Drivers may not use a car that is more than 12 years old and must pass automotive inspections as dictated by Lyft.  Drivers are rewarded for driving cars of a certain age and punished for driving cars that are older.

32.    Drivers must carry their own insurance, but Lyft also provides Drivers with liability and uninsured/underinsured coverage while they are logged into the Lyft App and driving Riders.

33.    Lyft is solely responsible for recording Drivers' rides, including the time and distance for each ride, the ride fare and added Lyft fees, Prime Time Premiums, and other tips, and for compiling Drivers' rates of pay for each ride.

34.    <u>Lyft Controls the Terms of Employment</u>.  Lyft maintains uniform policies and terms of service with which all Drivers must comply.  Once Drivers pass Lyft's initial requirements, they work for Lyft for an indefinite period of time.  However, Lyft may fire Drivers at any time and for any reason, and may shut down Drivers' access to the Lyft App at any time, thus preventing them from obtaining and responding to ride requests.

**Lyft Violates Drivers' Rights To 100% of Payments Intended for Them.**

35.    Lyft informs Riders when Prime Time percentage increases are in effect and Riders may voluntarily pay this rate "for the driver" by clicking a confirmation button requesting the Prime Time ride.  Riders may also refuse to pay the Prime Time rate by declining to request the ride.  In this way, Riders decide whether to leave additional money for the Drivers beyond the fare due to Lyft for the ride.

- 8 -

36.     In spite of each Rider's designation of Prime Time Premium payments for the Driver, Lyft takes 20% of the Prime Time Premium for each Prime Time ride, denying the Driver a payment intended for him by the Rider, unfairly misrepresenting its pledge to pay the Driver 100% of Prime Time Premiums, breaching its agreement with the Rider to pay the Prime Time Premium to the Driver, and interfering with the Driver's economic benefit from that agreement.

37.     Because Lyft misrepresents Prime Time Premiums as payment "for the driver," Riders use Lyft's Tip feature less frequently than they would otherwise, thus decreasing tip earnings that Drivers otherwise would receive were Riders correctly informed about Lyft's policy of taking a portion of Prime Time Premiums.

### Lyft Has Chosen for California Law To Apply To All Drivers And Riders, And the Relevant Practices Emanated from California.

38.     Lyft's Terms of Service, available at https://www.lyft.com/terms (dated February 8, 2016), provide that California law applies to the acts complained of herein. Specifically, Lyft explains:  "This Agreement shall be governed by the laws of the State of California without regard to choice of law principles."  Terms of Service, ¶ 21.

39.     Lyft conceived, reviewed, approved, and otherwise controls Prime Time Premium policies and practices from its headquarters in San Francisco, California, and makes them public through the Lyft App, which is maintained in and used in California.  Lyft's transactions with Riders, including the billing and payment for Drivers' are processed on Lyft servers in San Francisco, California.

### CALIFORNIA CLASS ACTION ALLEGATIONS

40.     The Plaintiffs bring the First Claim for Relief for violation of California's Unfair Competition Law, pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), on behalf of all California Class members, defined above.

41.     Numerosity (Fed. R. Civ. P. 23(a)(1)) – The California Class is so numerous that joinder of all members is impracticable.  Plaintiffs are informed and believe, and

on that basis allege, that during the California Class Period defendant Lyft has employed at least one hundred persons who satisfy the definition of the California Class.

42. <u>Commonality</u> (Fed. R. Civ. P. 23(a)(2)) – Common questions of law and fact exist as to members of the California Class, including the following:

  a. Whether Lyft's Drivers are employees or independent contractors;

  b. Whether Prime Time Premiums are gratuities under California law;

  c. Whether Lyft policies and practices violated the UCL and California Labor Code § 351;

  d. The proper measure of damages sustained by members of the California Class.

43. <u>Typicality</u> (Fed. R. Civ. P. 23(a)(3)) – Plaintiffs' claims are typical of California Class members' claims. Plaintiffs, like other California Class members, were subjected to Lyft's policy and practice of unlawfully taking gratuities in violation of California law. Plaintiffs' job duties and claims were and are typical of those of the California Class members.

44. <u>Adequacy</u> (Fed. R. Civ. P. 23(a)(4)) – Plaintiffs will fairly and adequately represent and protect the interests of the California Class members.

45. <u>Adequacy of counsel</u> (Fed. R. Civ. P. 23(g)) – Plaintiffs have retained counsel competent and experienced in complex class actions, and federal and state labor and employment litigation. Plaintiffs' counsel have litigated numerous class actions on behalf of nonexempt employee claims under federal and state law. Plaintiffs' counsel intend to commit the necessary resources to prosecute this action vigorously for the benefit of all Class members.

46. Class certification for the First Claim for Relief is appropriate pursuant to Fed. R. Civ. P. 23(b)(2), because Lyft has acted or refused to act on grounds generally applicable to the California Class, making appropriate declaratory and injunctive relief with respect to the

- 10 -

Class Action Complaint

Plaintiffs and the California Class as a whole.  Plaintiffs are entitled to injunctive relief to end Lyft's common and uniform practice of unlawfully taking employee gratuities.

47.     <u>Predominance</u> and <u>superiority</u> (Fed. R. Civ. P. 23(b)(3)) – Class certification of the First Claim for Relief is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the California Class predominate over any questions affecting only individual members of the California Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Lyft's common and uniform policies and practices involve unlawfully taking gratuities from California Class members.  The damages suffered by individual California Class members are relatively small compared to the significant expense and burden of individual prosecution of this litigation.  In addition, class certification is superior because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Lyft's practices.

48.     <u>Notice</u> (Fed. R. Civ. P 23(c)(2)(B)) – Plaintiffs intend to send notice to all members of the California Class to the extent required by Rule 23.

## **NATIONWIDE CLASS ACTION ALLEGATIONS**

49.     The Plaintiffs bring the Third, Fourth, Fifth, and Sixth Claims for Relief for violation of unfair business practices under the UCL, conversion, third party beneficiary breach of contract, and tortious interference with prospective economic advantage, pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), on behalf of the Nationwide Class, defined above.

50.     <u>Numerosity</u> (Fed. R. Civ. P. 23(a)(1)) – The Nationwide Class is so numerous that joinder of all members is impracticable.  Plaintiffs are informed and believe, and on that basis allege, that during the Nationwide Class Period defendant Lyft has employed at least one hundred persons who satisfy the definition of the Nationwide Class.

51.     <u>Commonality</u> (Fed. R. Civ. P. 23(a)(2)) – Common questions of law and fact exist as to members of the Nationwide Class, including the following:

a.     Whether California law applies to transactions outside of California;

b.       Whether Lyft violated conversion law by retaining Drivers' property in the form of Prime Time Premiums;

c.       Whether Lyft breached a contract with Riders that was made for the benefit of Drivers;

d.       Whether Lyft unlawfully interfered with Riders' Prime Time payments to Drivers;

e.       Whether Lyft unfairly misrepresented its Prime Time program and took Prime Time Premiums that Riders intended for Drivers; and

f.       The proper measure of damages sustained by members of the Nationwide Class.

52.     Typicality (Fed. R. Civ. P. 23(a)(3)) – Plaintiffs' claims are typical of Nationwide Class members' claims.  Plaintiffs, like other Nationwide Class members, were subjected to Lyft's policy and practice of taking Prime Time payments in violation of California's UCL and common law.  Plaintiffs' job duties and claims were and are typical of those of the Nationwide Class members.

53.     Adequacy (Fed. R. Civ. P. 23(a)(4)) – Plaintiffs will fairly and adequately represent and protect the interests of the Nationwide Class members.

54.     Adequacy of counsel (Fed. R. Civ. P. 23(g)) – Plaintiffs have retained counsel competent and experienced in complex class actions, and federal and state labor and employment litigation.  Plaintiffs' counsel has litigated numerous class actions on behalf of nonexempt employee claims under federal and state law.  Plaintiffs' counsel intends to commit the necessary resources to prosecute this action vigorously for the benefit of all Class members.

55.     Class certification of the Third, Fourth, Fifth, and Sixth Claims for Relief is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Lyft has acted or refused to act on grounds generally applicable to the Nationwide Class, making appropriate declaratory and injunctive relief with respect to the Plaintiffs and the Nationwide Class as a whole.  Plaintiffs are

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

entitled to injunctive relief to end Lyft's common and uniform practice of misrepresenting its Prime Time plan and taking Prime Time payments Riders intend for Drivers.

56.    <u>Predominance</u> and <u>superiority</u> (Fed. R. Civ. P. 23(b)(3)) – Class certification of the Third, Fourth, Fifth, and Sixth Claims for Relief is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Nationwide Class predominate over any questions affecting only individual members of the Nationwide Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Lyft's common and uniform policies and practices include misrepresenting its Prime Time plan and taking Prime Time payments Riders intend for Drivers. The damages suffered by individual Nationwide Class members are relatively small compared to the significant expense and burden of individual prosecution of this litigation. In addition, class certification is superior because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Lyft's practices.

57.    <u>Notice</u> (Fed. R. Civ. P 23(c)(2)(B)) – Plaintiffs intend to send notice to all members of the Nationwide Class to the extent required by Rule 23.

**FIRST CLAIM FOR RELIEF**
**(Unlawful Taking of a Gratuity, Cal. Bus. & Prof. Code § 17200,**
**Brought by Plaintiffs on Behalf of Themselves and the California Class)**

58.    Plaintiffs, on behalf of themselves and the California Class reallege and incorporate by reference all other paragraphs as if they were set forth again herein.

59.    At all relevant times, Lyft has been an employer, and Plaintiffs and California Class members were, are, or will be employees under California law.

60.    Plaintiffs and the California Class members therefore are entitled to the protections of California Labor Code § 351, which prohibits employers from taking gratuities paid or left for an employee. Section 351 provides, in full:

> No employer or agent shall collect, take, or receive any
> gratuity or a part thereof that is paid, given to, or left for an
> employee by a patron, or deduct any amount from wages
> due an employee on account of a gratuity, or require an
> employee to credit the amount, or any part thereof, of a

- 13 -

gratuity against and as a part of the wages due the
employee from the employer. Every gratuity is hereby
declared to be the sole property of the employee or
employees to whom it was paid, given, or left for. An
employer that permits patrons to pay gratuities by credit
card shall pay the employees the full amount of the gratuity
that the patron indicated on the credit card slip, without any
deductions for any credit card payment processing fees or
costs that may be charged to the employer by the credit
card company. Payment of gratuities made by patrons using
credit cards shall be made to the employees not later than
the next regular payday following the date the patron
authorized the credit card payment.

61.     The foregoing conduct, as alleged, violates the California Unfair

Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, which prohibits, *inter alia*,

unfair competition in the form of any unlawful, unfair, deceptive, or fraudulent business practices.

Plaintiffs bring this cause of action individually and as representatives of all others subject to

Lyft's unlawful acts and practices.

62.     By taking, receiving, and/or retaining a portion of Prime Time Premiums,

Lyft committed unlawful, unfair, deceptive, and/or fraudulent acts as defined by the UCL.

a.     Lyft engaged in unlawful acts by retaining of a portion of the

Prime Time Premiums, because such acts violate California Labor Code § 351.

b.     Lyft engaged in unfair acts by retaining of a portion of the Prime

Time Premiums, because such acts are contrary to public policy.

c.     Lyft engaged in fraudulent acts by retaining of a portion of the

Prime Time Premiums, because Lyft communicated to Drivers and Riders that 100% of the Prime

Time Premiums would be paid to Drivers, when in reality it was taking 20% for itself.

63.     As a result of this unlawful and/or unfair business practice, Lyft reaped

unfair benefits and illegal profits at the expense of Plaintiffs and Class Members.  Lyft must

disgorge these ill-gotten gains and restore to Plaintiffs and Class Members all wrongfully

withheld portions of the Prime Time Premiums.  Lyft's actions deprived Plaintiffs and each

member of the California Class portions of their Prime Time Premiums; consequently, they are

entitled to restitution in the amount of the portions of their Prime Time Premiums that Lyft

withheld from the Drivers.

Class Action Complaint

**SECOND CLAIM FOR RELIEF**
**(California PAGA Claim, Cal. Labor Code §§ 2698-2699.5,**
**Brought by Plaintiffs on Behalf of Themselves and the California Class)**

64.     Plaintiffs, on behalf of themselves and all members of the California Class, reallege and incorporate by reference all other paragraphs as if they were set forth again herein.

65.     Under PAGA, an aggrieved employee, on behalf of him- or herself and other current or former employees as well as the general public, may bring a representative action as a private attorney general to recover penalties for an employer's violations of the California Labor Code.  These civil penalties are in addition to any other relief available under the Cal. Labor Code, and must be allocated 75% to California's Labor and Workforce Development Agency and 25% to the aggrieved employee, pursuant to Cal. Labor Code § 2699.

66.     At all relevant times, Lyft has been an employer, and Plaintiffs and California Class members were, are, or will be employees under California law.

67.     Pursuant to Cal. Labor Code § 351, Lyft's unlawful taking of gratuities paid by Riders as Prime Time Tips or payments to Plaintiffs and California Class members constitutes a violation of the Labor Code actionable under PAGA.

68.     The Plaintiffs allege, on behalf of themselves and the California Class, as well as the general public, that Lyft has violated Cal. Labor Code § 351 as previously described herein.  This violation entitles Plaintiffs, as private attorneys general, to recover the applicable statutory civil penalties on their own behalf, on behalf of all aggrieved employees, and on behalf of the general public.

69.     Cal. Labor Code § 2699(a), which is part of PAGA, provides in pertinent part:

> Notwithstanding any other provision of law, any provision of this code that provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency or any of its departments, divisions, commissions, boards, agencies, or employees, for a violation of this code, may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself and other current or former employees pursuant to the procedures specified in § 2699.3.

70.     Cal. Labor Code § 2699(f), which is part of PAGA, provides in pertinent part:

> For all provisions of this code except those for which a civil penalty is specifically provided, there is established a civil penalty for a violation of these provisions, as follows: … (2) If, at the time of the alleged violation, the person employs one or more employees, the civil penalty is one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation.

71.     Plaintiffs are entitled to civil penalties, to be paid by Lyft and allocated as appropriate, pursuant to Cal. Labor Code § 2699(f) for Lyft's violation of Cal. Labor Code § 351, for which a civil penalty is not already specifically provided.

72.     On May 11, 2016, Plaintiffs provided written notice by certified mail to the California Labor & Workforce Development Agency ("LWDA") and to Lyft of the legal claims and theories of this case, contemporaneous with the filing of the Complaint in this action.

73.     Under PAGA, the Plaintiffs and the State of California are entitled to recover the maximum civil penalties permitted by law for the violations of the Cal. Labor Code § 351 as alleged in this Complaint.

### THIRD CLAIM FOR RELIEF
### (Conversion,
### Brought by Plaintiffs on Behalf of Themselves and the Nationwide Class)

74.     Plaintiffs, on behalf of themselves and all members of the Nationwide Class, reallege and incorporate by reference all other paragraphs as if they were set forth again herein.

75.     Lyft's Terms of Service provide for application of California law to all transactions in the United States, without regard to choice-of-law principles.  Regardless, applicable choice-of-law principles would require application of California law to the claims of the Nationwide Class.

76.     The foregoing conduct, as alleged, constitutes unlawful conversion under California and other states' law, because Plaintiffs and all Nationwide Class members had a right

to the full amount of each Prime Time Premium paid to them by Riders.  These amounts are property under California and other states' laws, either because they are gratuities or because they are property given to Drivers by Riders.  *See, e.g.,* Cal. Labor Code § 351.

77.     Lyft had a policy and practice of failing and refusing to pay Plaintiffs and Nationwide Class members the full amount of the Prime Time Premiums, as intended by Riders, which constitutes the wrongful disposition of the property rights of Plaintiffs and Nationwide Class members.

78.     Plaintiffs and the Nationwide Class members suffered damages resulting from Lyft's conduct, including lost portions of the Prime Time Premiums, interest, and such relief as the Court deems just and proper.

79.     Plaintiffs, on behalf of themselves and the Nationwide Class members, seek damages in the amount of the respective unpaid portions of the Prime Time Premiums owed to them, attorneys' fees and costs, and such other legal and equitable relief as the Court deems just and proper.

**FOURTH CLAIM FOR RELIEF**
**(Breach of Contract, Third Party Beneficiary,**
**Brought by Plaintiffs on Behalf of Themselves and the Nationwide Class)**

80.     Plaintiffs, on behalf of themselves and all members of the Nationwide Class, reallege and incorporate by reference all other paragraphs as if they were set forth again herein.

81.     Lyft's Terms of Service provide for application of California law to all transactions in the United States, without regard to choice-of-law principles.  Regardless, applicable choice-of-law principles would require application of California law to the claims of the Nationwide Class.

82.     The foregoing conduct, as alleged, constitutes breach of contract made for the benefit of Lyft Drivers under California and other states' law.

83.     Lyft entered into contracts with Riders whereby Riders agreed to pay the Prime Time Premium "entirely to your Driver" or "for the Driver."  Riders clearly demonstrated

- 17 -

their intention for the Prime Time payment to go to the Driver by clicking a button in the Lyft App that explicitly asked Riders to confirm that they would make an additional Prime Time payment "entirely to your Driver" or "for the Driver."

84.     Lyft had a policy and practice of failing and refusing to pay Plaintiffs and Nationwide class members the full amount of the Prime Time Premium, as intended by Riders, and thus breached and continues breaching its Prime Time ride contracts with Riders made for the benefit of Lyft Drivers.

85.     Plaintiffs and the Nationwide Class members suffered damages resulting from Lyft's breach of contract, including lost portions of the Prime Time Premium, interest, and such relief as the Court deems just and proper.

86.     Plaintiffs, on behalf of themselves and the Nationwide Class members, seek damages in the amount of the respective unpaid portions of Prime Time payments owed them, attorneys' fees and costs, and such other legal and equitable relief as the Court deems just and proper.

**FIFTH CLAIM FOR RELIEF**
**(Tortious Interference with Prospective Economic Advantage,**
**Brought by Plaintiffs on Behalf of Themselves and the Nationwide Class)**

87.     Plaintiffs, on behalf of themselves and all members of the Nationwide Class, reallege and incorporate by reference all other paragraphs as if they were set forth again herein.

88.     Lyft's Terms of Service provide for application of California law to all transactions in the United States, without regard to choice-of-law principles.  Regardless, applicable choice-of-law principles would require application of California law to the claims of the Nationwide Class.

89.     The foregoing conduct, as alleged, constitutes a tort of interference with the prospective economic advantage of Plaintiffs and Nationwide Class members under California and other states' law.

90.     Lyft entered into an agreement with Riders whereby Riders agreed to pay the Prime Time Premium "for the Driver."  This agreement created an economic relationship between the Riders and the Drivers that carried a probability of future benefit to the Drivers.

91.     Lyft knew of this existing relationship and intentionally disrupted it by taking a portion of Prime Time Premiums that Riders intended for the Drivers, thus causing the Drivers economic harm.

92.     Lyft had a policy and practice of failing and refusing to pay Plaintiffs and Nationwide Class members the full amount of the Prime Time Premiums, as intended by Riders, and thus interfered and continues to interfere in the economic advantage of Plaintiffs and Nationwide Class members.

93.     These acts are independently unlawful under California Labor Code section 351 and as an unlawful, unfair, and/or fraudulent business practices under the California Unfair Competition Law.

94.     Plaintiffs and the Nationwide Class members suffered damages resulting from Lyft's conduct, including lost portions of Prime Time Premiums, interest, and such relief as the Court deems just and proper.

95.     Plaintiffs, on behalf of themselves and the Nationwide Class members, seek damages in the amount of the respective unpaid portions of Prime Time Premiums owed them, attorneys' fees and costs, and such other legal and equitable relief as the Court deems just and proper.

### SIXTH CLAIM FOR RELIEF
#### (Unfair Business Practices, Cal. Bus. & Prof. Code § 17200, Brought by Plaintiffs on Behalf of Themselves and the Nationwide Class)

96.     Plaintiffs, on behalf of themselves and all members of the Nationwide Class, reallege and incorporate by reference all other paragraphs as if they were set forth again herein.

97.     By taking, receiving, and/or retaining a portion of Prime Time Premiums, Lyft committed unlawful, unfair, deceptive, and/or fraudulent acts as defined by the UCL.

a.      Lyft engaged in unlawful acts by retaining of a portion of the Prime Time Premiums, because such acts constitute conversion, breach of contract, and tortious interference with prospective economic advantage.

b.      Lyft engaged in unfair acts by retaining of a portion of the Prime Time Premiums, because such acts are contrary to public policy.

c.      Lyft engaged in fraudulent acts by retaining of a portion of the Prime Time Premiums, because Lyft communicated to Drivers and Riders that 100% of the Prime Time Premiums would be paid to Drivers, when in reality it was taking 20% for itself.

98.      As a result of this unlawful and/or unfair business practice, Lyft reaped unfair benefits and illegal profits at the expense of Plaintiffs and Class Members.  Lyft must disgorge these ill-gotten gains and restore to Plaintiffs and Class Members all wrongfully withheld portions of the Prime Time Premiums.  Lyft's actions deprived Plaintiffs and each member of the Nationwide Class portions of their Prime Time Premiums; consequently, they are entitled to restitution in the amount of the portions of their Prime Time Premiums that Lyft withheld from the Drivers.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs behalf of themselves and all class members pray for relief as follows:

A.      Certification of the California and Nationwide classes;

B.      Designation of Plaintiffs as Representatives of each class;

C.      Designation of Plaintiffs' counsel of record as Class Counsel for the classes;

D.      A declaratory judgment that the practices complained of herein are unlawful under state law;

E.      An injunction against Lyft and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with it, as provided by law, from engaging in each of the unlawful practices, policies, and patterns set forth herein;

1

2

    F.  Appropriate statutory penalties;

3

    G.  An award of damages and restitution to be paid by Lyft according to proof;

4

    H.  Pre-judgment and post-judgment interest, as provided by law;

5

    I.  Such other injunctive and equitable relief as the Court may deem just and

6

proper;

7

    J.  Attorneys' fees and costs of suit, including expert fees and costs; and

8

    K.  Appropriate service payments to Plaintiffs for their service as Class

9

representatives.

10

## DEMAND FOR JURY TRIAL

11

    Plaintiffs hereby demand a jury trial on all causes of action and claims with respect

12

to which they have a right to jury trial.

13

Dated:  May 11, 2016    Respectfully submitted,

14

        By:  */s/ Jahan C. Sagafi*
          Jahan C. Sagafi

15

16

        Jahan C. Sagafi (Cal. Bar No. 227887)
        jsagafi@outtengolden.com

17

        Julia Rabinovich (Cal. Bar No. 290730)
        jrabinovich@outtengolden.com

18

        Relic Sun (Cal. Bar No. 306701)
        rsun@outtengolden.com

19

        OUTTEN & GOLDEN LLP
        One Embarcadero Center, 38th Floor

20

        San Francisco, CA 94111
        Telephone:  (415) 638-8800

21

        Facsimile:  (415) 638-8810

22

        Rachel M. Bien (pro hac vice motion forthcoming)

23

        rmb@outtengolden.com
        OUTTEN & GOLDEN LLP

24

        3 Park Avenue, 29th Floor
        New York, NY 10016

25

        Telephone:  (212) 245-1000

26

        Facsimile:  (646) 509-2060

27

        *Counsel for Plaintiffs, Aggrieved Employees, and Proposed*
        *Class Members*

28