Jahan C. Sagafi (Cal. Bar No. 227887)
jsagafi@outtengolden.com
Relic Sun (Cal. Bar No. 306701)
rsun@outtengolden.com
OUTTEN & GOLDEN LLP
One Embarcadero Center, 38th Floor
San Francisco, CA 94111
Telephone:  (415) 638-8800
Facsimile:  (415) 638-8810

Rachel Bien (Cal. Bar No. 315886)
rmb@outtengolden.com
Michael J. Scimone (admitted *pro hac vice*)
mscimone@outtengolden.com
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone:  (212) 245-1000
Facsimile:  (646) 509-2060

*Counsel for Plaintiffs, Aggrieved Employees,
and Proposed Class Members*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| ALEX ZAMORA and RAYSHON CLARK on behalf of themselves and all those similarly situated,<br><br>    Plaintiffs<br><br>        v.<br><br>LYFT, INC.,<br><br>    Defendant. | Case No. 3:16-cv-02558-VC<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW AND COMMON LAWS;**<br><br>**CLAIMS FOR DAMAGES AND INJUNCTIVE RELIEF;**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Alex Zamora and Rayshon Clark ("Plaintiffs") allege, on behalf of themselves and all those similarly situated, as follows:

## JURISDICTION AND VENUE

1.     This Court has original jurisdiction over all claims pursuant to 28 U.S.C. § 1332(d), because this case is a class action involving more than 100 class members; the amount in controversy exceeds $5,000,000, exclusive of interest and costs; and at least some members of the proposed class have different citizenship from the Defendant, Lyft, Inc. ("Lyft" or "Defendant").  *See* 28 U.S.C. § 1332 (d); *Serrano v. 180 Connect, Inc.*, 478 F.3d 1018, 1021 (9th Cir. 2007).

2.     The United States District Court for the Northern District of California has personal jurisdiction over Defendant because Lyft's principal place of business is in this District and many of the acts complained of and giving rise to the claims alleged took place in California and in this District.

3.     Venue is proper in either the San Francisco or Oakland Divisions of this District pursuant to 28 U.S.C. §§ 1391(b), (c)(2) and Civil L.R. 3-2(d) because Defendant resides in San Francisco and a substantial part of the events giving rise to the claims occurred and/or emanated from there.

4.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## SUMMARY OF CLAIMS

5.     Plaintiffs are individuals who have worked as drivers for Lyft ("Drivers").  They bring this class action on behalf of themselves and all others similarly situated.

### Prime Time Premium Claims

6.     Plaintiffs allege that Lyft maintains an unlawful policy and practice of taking a portion of the money that Lyft passengers ("Riders") pay pursuant to Lyft's "Prime Time" premium pricing policies, even though, until 2017, Lyft consistently told Riders that the Prime Time Premiums go to the Drivers.  During periods of high Rider demand relative to Driver supply (called "Prime Time"), Lyft charges Riders a premium (the "Prime Time Premium"), which is an amount above the base price for a ride.  Although its marketing of the Prime Time Premium has evolved over time, until 2017, Lyft consistently communicated to each Rider that the Prime Time Premium will be paid wholly to the

Driver.  Drivers, who access the Lyft platform through "Driver mode," are not privy to the information that Riders receive in "Passenger mode."  Therefore, Drivers were unaware of this fraudulent misrepresentation.  Contrary to what Lyft communicated to Riders, Lyft takes approximately 20%[1] of the Prime Time Premiums for itself.

7.      Plaintiffs allege that this practice is unlawful in two ways.

a.      <u>First</u>, this practice constitutes an unlawful taking of an employee's gratuities. Because Lyft should have classified the Drivers as employees, not independent contractors, the Drivers are entitled to keep gratuities paid to them by customers (the Riders).  This claim is brought under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL") (based on its unlawfulness as a violation of Cal. Labor Code § 351, its unfairness, and its fraudulent nature) and the California Private Attorneys General Act, Cal. Labor Code §§ 2698-2699.5 ("PAGA") (based on its unlawfulness as a violation of Cal. Labor Code § 351) on behalf of all Drivers in California.

b.      <u>Second</u>, this practice violates Drivers' statutory and common law rights, independent of their employment status.  This set of claims is brought under the UCL and common-law breach of contract, on behalf of all Drivers in California.

8.      Through their classwide claims, Plaintiffs seek repayment of all portions of the Prime Time Premiums unlawfully taken by Lyft; restitution and/or disgorgement of all profits obtained by Lyft from its unlawful and unfair business practices; all penalties and other damages permitted by law; injunctive and declaratory relief; all other forms of equitable relief permitted by law; reasonable attorneys' fees and costs; and service payments for the Class Representatives.

**California Labor Code Claims**

9.      Plaintiffs further allege that Lyft has violated and continues to violate additional California Labor Code protections applicable to Lyft Drivers because they should be classified as employees rather than independent contractors.  These violations include the failure to (1) reimburse Drivers for their expenses, (2) pay overtime, (3) pay minimum wage, (4) provide itemized wage

---

[1] In New York City, this portion is 34.6%, instead of 20%.  Lyft also began taking a 25% portion of rides provided by drivers who began working for Lyft after January 2016.  For simplicity's sake, the 20% figure is used herein even though 34.6% applies in New York City and 25% applies to new drivers.

statements, and (5) keep accurate payroll records.  Plaintiffs bring these claims under the California Labor Code, UCL, and PAGA on behalf of all Drivers in California from May 11, 2012 through the date of the final disposition of this action.  Plaintiffs allege that these Labor Code violations are unlawful, unfair, and fraudulent under the UCL and that they are entitled to recover penalties under PAGA.

## SUMMARY OF CLASS ACTION ALLEGATIONS

10.    The Class.  Plaintiffs bring this action on behalf of all Lyft Drivers in California from the earlier of four years before the filing of the original Complaint in this action or the date Lyft began taking a portion of Prime Time payments through the date of the final disposition of this action (the "California Class Period").  On behalf of the California Class, Plaintiffs assert claims of California Labor Code violations, of unlawful business practices under the UCL, breach of contract, and claims pursuant to PAGA.

## THE PARTIES

11.    Plaintiff Alex Zamora is a resident of Oakland, California.  Mr. Zamora has worked as a Lyft Driver from approximately March 2015 to the present in the San Francisco Bay Area.  During this time, when he has been actively driving for Lyft, Mr. Zamora has worked approximately up to 30 or more hours per week, with some periods of time worked over eight hours a day or 40 hours per week. He has given many rides covered by the Prime Time Premium pricing model.  Mr. Zamora's precise hours, pay, and revenue generated for Lyft pursuant to its Prime Time Premium model are available by reference to Lyft's records.

12.    Plaintiff Rayshon Clark is a resident of Benicia, California.  Mr. Clark has worked as a Lyft Driver from approximately September 15, 2015 to the present in the San Francisco Bay Area. During this time, Mr. Clark has often worked approximately 30 to 50 hours per week as a Lyft driver including periods of working more than eight hours per day.  He has given many rides covered by the Prime Time Premium pricing model.  Mr. Clark's precise hours, pay, and revenue generated for Lyft pursuant to its Prime Time Premium model are available by reference to Lyft's records.

13.    Defendant Lyft, Inc. is a Delaware corporation with its corporate headquarters and primary place of business in San Francisco, California, and operations in at least 33 other states in the

United States.  The practices described in this Complaint were designed at, emanated from, and carried out by agents in Lyft's San Francisco, California headquarters.

## FACTUAL BACKGROUND

14.     Lyft is a "ridesharing"[2] business that originated in San Francisco, California, in 2012 and portrays itself – in contrast to its powerful competitor, Uber – as an egalitarian, community-minded company with friendly drivers whom Lyft values more and treats better than Uber treats its drivers. Though promoting this image, Lyft has engaged in practices that violate laws regarding the pay and working conditions of its Drivers.  First, after touting that Lyft drivers, unlike Uber drivers, always receive 100% of the Prime Time Premiums that Riders pay, Lyft began taking a portion of the Prime Time Premiums" for itself.  Second, Lyft has misclassified Drivers as independent contractors, with the result of avoiding obligations Lyft otherwise would have to employees, such as refraining from taking gratuities; reimbursing expenses; paying overtime and the minimum wage; and complying with requirements to provide itemized wage statements and maintain accurate payroll records.

**Lyft Misrepresents Prime Time Premiums as a Payment for the Driver, When in Fact Lyft Takes a Portion of the Prime Time Premiums.**

15.     Lyft uses a "Prime Time" pricing scheme to pay Drivers more during busy periods, yet takes a portion of the Prime Time Premium that Riders intend to pay solely to Drivers.

16.     Lyft's Prime Time Premium pricing, akin to Uber's "surge" pricing, is a program whereby Lyft charges Riders a premium for rides during times of high Rider demand relative to Driver supply.  The history of this program is set forth below.

17.     Beginning in approximately December 2013, Lyft invented and implemented Prime Time Premium pricing as "Prime Time Tips."  When Lyft announced the Prime Time Premium in November 2013, it assured the public generally, and Riders and Drivers specifically, that 100% of the Prime Time Tip would be kept by Drivers, and Lyft would take none for itself.

---

[2] Lyft provides Riders with transportation by connecting them with Lyft Drivers through a mobile phone application (the "Lyft App").  The Driver then transports the Rider, and the Rider pays Lyft for the service with a credit card via the Lyft App.  The Lyft App sets the fare to be paid by the Rider.  A Rider may tip the Driver by designating an amount in the Lyft App.  Lyft then pays the Driver approximately 80% of the ride fare plus 100% of any added tip.  Lyft keeps approximately 20% of the fare for itself.

18.     An article heralding the launch of Prime Time Tips, found at https://pando.com/2013/11/22/lyft-introduces-uber-style-surge-pricing-urges-us-not-to-call-it-that/, explained:  "Perhaps most importantly, the drivers will keep all the extra money, unlike Uber, where the company scarfs down a 20 percent cut."  The article quoted Lyft President John Zimmer:  "'It's different – it's the Lyft way of doing things,' Zimmer says.  'We wanted to make sure our incentives were aligned with every member of the community:  Drivers and passengers.'"

19.     The article focused on the difference in ethos between Lyft (more "egalitarian," and "all about community, casualness, and letting the good times ride") and Uber (more "capitalistic" and "all about seriousness").  The article opened by noting: "Uber and Lyft have long been polar opposites in the urban transportation wars."  The article quoted a Lyft investor as emphasizing the "special Lyft quality" of Prime Time Tips.

20.     In conclusion, the article summarized the main competitive advantage of Lyft's Prime Time Tips over Uber's surge pricing, explaining that "[t]he key to communicating the difference in Lyft's approach to surge pricing" is "simple":  "Lyft drivers keep all the extra money from Prime Time Tips.  Because no matter how close these companies veer towards one another, Uber will never be able to resist taking its cut."

21.     In an article a month later, the same author corrected some misconceptions from the earlier article, but reiterated in the opening lines that the fact that Lyft drivers would retain 100% of the Prime Time Tips income was correct.  In short, the number one difference between Uber's surge pricing and Lyft's Prime Time Tips was this:  "Unlike Uber which takes a 20 percent cut, Lyft won't keep any of the money from Prime Time Tips.  It will all go to the drivers themselves."  Lyft President Zimmer confirmed:  "No matter what, we'll always have the most affordable ride because we're not taking any amount from that [Prime Time] increase."

22.     Beginning on approximately August 18, 2014, Lyft began taking approximately 20% of the Prime Time Premiums collected from Riders.  Upon information and belief, Lyft did not announce this change to Riders through a press release or formal announcement.

23.     Instead, Lyft made certain changes to the notice that Riders received in the Lyft App when Prime Time pricing is in effect.  Examples of before and after images reflect these changes:




2013                    2014

24.     Even after Lyft began taking a portion of Prime Time, it continued to state, in large font, that the premium goes "to your driver,"[3] and that the purpose of the premium is still "to encourage more people to drive."

25.     Not all Riders saw these changes, however.  Some continued to see a notice in the Lyft App describing the Prime Time Premium as a "tip" that "goes entirely to your driver."  Upon information and belief, this is because Lyft decided not to introduce the new language until Riders downloaded the latest version of the App.  Online posts from customers show that many continued to believe the premium was a tip in 2014 and into 2015, which Lyft did not rebut in responses to their complaints.  *See Zamora* Plaintiffs' Submission of Documents Regarding Lyft's Prime Time Premium Practices, *Cotter* ECF No. 228-7, 228-10.

26.     Plaintiffs would have driven less during Prime Time had they known that Lyft was misrepresenting to Riders that the premium goes "to your driver."  In fact, once Plaintiff Zamora discovered Lyft's misrepresentation to Riders, he discontinued accepting rides through Lyft and currently drives primarily for Uber.  Plaintiff Zamora would have switched from Lyft to Uber earlier if

---

[3] Lyft has also used slightly different language during this period, stating that the Prime Time Premium was "for the driver."

he had known about Lyft's misrepresentation.  Plaintiff Zamora now makes considerably more money driving for Uber, so his decision to continue driving for Lyft caused him significant financial harm.

27.     Lyft removed the "to your driver" language from the notice Riders receive in the Lyft App in or around April 2017.

28.     Legally, the Prime Time Premium is either (1) a tip for an employee Driver or (2) a promise to the customer that the independent contractor Driver will receive the entire amount of the premium (akin to a tip, but for an independent contractor).

**Lyft's Drivers Are Misclassified As Independent Contractors And Should Be Classified As Employees.**

29.     <u>Drivers Are Central to Lyft's Business</u>.  Lyft Drivers are the face of Lyft.  Drivers provide the service that Lyft sells to the public.  Drivers are encouraged to be friendly and fun and professional.  Their dedication and effort has created Lyft's reputation as a company that is friendlier than its rival, Uber.  Lyft rewards Drivers for what it deems great performance and punishes Drivers for what it deems poor performance.

30.     Lyft earns money by providing its customers with a ride from point A to point B – a service that is wholly dependent on Drivers.  Drivers' interactions with Riders create the service and experience that Lyft promotes as more friendly and satisfying than the service Uber provides.

31.     As part of Lyft's requirements, Drivers must receive training in how to interact with Riders and Lyft pairs Drivers with mentors who further educate them about Lyft expectations and practices.  Lyft Drivers must pass criminal background and driving record checks and can be fired if, for any reason, Lyft decides that the Driver has not behaved appropriately; this includes failing to accept rides or receiving a low rating from a Rider, whether warranted or not.

32.     <u>Drivers Lack Business Autonomy</u>.  Drivers cannot provide their transportation services without the Lyft App.  Drivers are dependent on Lyft to identify Riders for them, may not hire employees to assist them in providing services for Lyft, and do not need to possess any particular skills other than those required to obtain a driver's license.

33.     Lyft prohibits Drivers from setting or in any way affecting the rates of pay for their own services.  Lyft also prohibits Drivers from communicating with Riders about future ride services and from exceeding Lyft's specified limit on the distance allowed for each ride.

34.     Drivers may not use a car that is more than 12 years old and must pass automotive inspections as dictated by Lyft.  Drivers are rewarded for driving cars of a certain age and punished for driving cars that are older.

35.     Drivers must carry their own insurance, but Lyft also provides Drivers with liability and uninsured/underinsured coverage while they are logged into the Lyft App and driving Riders.

36.     Lyft is solely responsible for recording Drivers' rides, including the time and distance for each ride, the ride fare and added Lyft fees, Prime Time Premiums and other tips, and for compiling Drivers' rates of pay for each ride.

37.     <u>Lyft Controls the Terms of Employment</u>.  Lyft maintains uniform policies and terms of service with which all Drivers must comply.  Once Drivers pass Lyft's initial requirements, they work for Lyft for an indefinite period of time.  However, Lyft may fire Drivers or shut down Drivers' access to the Lyft App for myriad reasons, thus preventing them from obtaining and responding to ride requests.

**Lyft Violates Drivers' Rights To 100% of Payments Intended For Them.**

38.     Lyft informs Riders when Prime Time Premium increases are in effect and Riders may voluntarily pay this rate "for the driver" by clicking a confirmation button requesting the Prime Time ride.  Riders may also refuse to pay the Prime Time Premium by declining to request the ride.  In this way, Riders decide whether to leave additional money for the Drivers beyond the fare due to Lyft for the ride.

39.     In spite of each Rider's designation of Prime Time Premium payments for the Driver, Lyft takes 20% of the Prime Time Premium for each Prime Time ride, denying the Driver a payment intended for him by the Rider, unfairly misrepresenting its pledge to pay the Driver 100% of Prime Time Premiums, and breaching its agreement with the Rider to pay the Prime Time Premium to the Driver.

40.     Because Lyft misrepresents Prime Time Premiums as payment "for the driver," Riders use Lyft's Tip feature less frequently than they would otherwise, thus decreasing tip earnings that Drivers otherwise would receive were Riders correctly informed about Lyft's policy of taking a portion of Prime Time Premiums.

**Lyft Violates Drivers' Rights Under The California Labor Code**

41.     <u>Taking gratuities</u>.  Lyft takes a portion of Prime Time Premiums paid by Riders to Drivers, even though the Prime Time Premiums are gratuities and the sole property of Lyft drivers.

42.     <u>Expense reimbursement</u>.  Lyft Driver expenses include mileage costs, cell phone service to maintain required email and/or text message contact with Lyft, car cleaning and repair to comply with Lyft requirements, and water, snacks, and/or other supplies for Riders, among other expenses.  Lyft does not reimburse Drivers for all of their work-related expenses.

43.     <u>Overtime and minimum wage</u>.  Lyft does not pay its Drivers overtime for hours worked over eight in a day or over 40 hours in a week.  Furthermore, although Lyft suffers or permits Drivers to log on to the Lyft App and make themselves available to pick up rides, Lyft fails to pay them the minimum wage for all hours actually worked in this way and instead limits their pay to a piece rate for each ride.  Even limiting the calculation of minimum wage to the hours a Lyft Driver is engaged in providing a ride, Lyft fails to pay Drivers a minimum wage for all hours worked.  There are also periods of time when Drivers report to work but there is no work or less than half of a normal day's work available because of Lyft's promotions, restrictions, and other policies and programs.

44.     <u>Wage statements and time records</u>.  Lyft's wage statements do not clearly itemize earnings in a way that Drivers can readily identify whether they received all applicable bonuses, premiums, and other tips and pay for which they were eligible under Lyft promotions, programs, or policies.  Payroll records similarly fail to track all pay eligibility accurately.

**CLASS ACTION ALLEGATIONS**

45.     The Plaintiffs bring the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Claims for Relief for violations of the California Labor Code, California's Unfair Competition

Law, and common law breach of contract pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), on behalf of all Class members, defined above.

46. <u>Numerosity</u> (Fed. R. Civ. P. 23(a)(1)) – The Class is so numerous that joinder of all members is impracticable.  Plaintiffs are informed and believe, and on that basis allege, that during the Class Period defendant Lyft has employed at least one hundred persons who satisfy the definition of the Class.

47. <u>Commonality</u> (Fed. R. Civ. P. 23(a)(2)) – Common questions of law and fact exist as to members of the Class, including the following:

      a.      Whether Lyft's Drivers are employees or independent contractors;

      b.      Whether Lyft breached a contract with Riders that was made for the benefit of Drivers;

      c.      Whether Prime Time Premiums are gratuities under California law;

      d.      Whether Lyft failed to reimburse Drivers for work-related expenses;

      e.      Whether Lyft failed to pay Drivers overtime;

      f.      Whether Lyft failed to pay Drivers the minimum wage;

      g.      Whether Lyft failed to pay Drivers reporting time pay;

      h.      Whether Lyft provide itemized wage statements;

      i.      Whether Lyft kept accurate payroll records;

      j.      Whether Lyft policies and practices violated the UCL, California Labor Code §§226, 351, 353, 510, 1174, 1182.12, 1194, 1194.2, 1197, 1197.1, 1198, 1199, 2802, and California Industrial Welfare Commission Wage Order No. 9-2001 ("Wage Order 9");

      k.      The proper measure of damages sustained by members of the Class.

48. <u>Typicality</u> (Fed. R. Civ. P. 23(a)(3)) – Plaintiffs' claims are typical of Class members' claims.  Plaintiffs, like other Class members, were subjected to Lyft's policies and practices that violated California law.  Plaintiffs' job duties and claims were and are typical of those of the Class members.

49. <u>Adequacy</u> (Fed. R. Civ. P. 23(a)(4)) – Plaintiffs will fairly and adequately represent and protect the interests of the Class members.

50.     <u>Adequacy of counsel</u> (Fed. R. Civ. P. 23(g)) – Plaintiffs have retained counsel competent and experienced in complex class actions, and federal and state labor and employment litigation. Plaintiffs' counsel have litigated numerous class actions on behalf of nonexempt employee claims under federal and state law.  Plaintiffs' counsel intend to commit the necessary resources to prosecute this action vigorously for the benefit of all Class members.

51.     Class certification for the Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Claims for Relief is appropriate pursuant to Fed. R. Civ. P. 23(b)(2), because Lyft has acted or refused to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to the Plaintiffs and the California Class as a whole.  Plaintiffs are entitled to injunctive relief to end Lyft's common and uniform practice of unlawfully classifying them as independent contractors rather than employees.

52.     <u>Predominance</u> and <u>superiority</u> (Fed. R. Civ. P. 23(b)(3)) – Class certification of the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Claims for Relief is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Lyft's common and uniform policies and practices involve unlawfully taking gratuities from Class members and failing to reimburse Drivers for their expenses, pay overtime, pay minimum wage, pay reporting time pay, provide itemized wage statements, and keep accurate payroll records.  The damages suffered by individual Class members are relatively small compared to the significant expense and burden of individual prosecution of this litigation.  In addition, class certification is superior because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Lyft's practices.

53.     <u>Notice</u> (Fed. R. Civ. P 23(c)(2)(B)) – Plaintiffs intend to send notice to all members of the Class to the extent required by Rule 23.

### FIRST CLAIM FOR RELIEF
### (Conversion,
### Brought by Plaintiffs on Behalf of Themselves and the Class)

54.     Plaintiffs, on behalf of themselves and all members of the Class, reallege and incorporate by reference all other paragraphs as if they were set forth again herein.

55.     The foregoing conduct, as alleged, constitutes unlawful conversion under California law, because Plaintiffs and all Class members had a right to the full amount of each Prime Time Premium paid to them by Riders.  These amounts are property under California law because they are gratuities given to Drivers by Riders.  *See, e.g.,* Cal. Labor Code § 351.

56.     Lyft had a policy and practice of failing and refusing to pay Plaintiffs and Class members the full amount of the Prime Time Premiums, as intended by Riders, which constitutes the wrongful disposition of the property rights of Plaintiffs and Class members.

57.     Plaintiffs and the Class members suffered damages resulting from Lyft's conduct, including lost portions of the Prime Time Premiums, interest, and such relief as the Court deems just and proper.

58.     Plaintiffs, on behalf of themselves and the Class members, seek damages in the amount of the respective unpaid portions of the Prime Time Premiums owed to them, attorneys' fees and costs, and such other legal and equitable relief as the Court deems just and proper.

### SECOND CLAIM FOR RELIEF
### (Breach of Contract, Third Party Beneficiary,
### Brought by Plaintiffs on Behalf of Themselves and the Class)

59.     Plaintiffs, on behalf of themselves and all members of the  Class, reallege and incorporate by reference all other paragraphs as if they were set forth again herein.

60.     Lyft's Terms of Service provide for application of California law to all transactions in the United States, without regard to choice-of-law principles.  Regardless, applicable choice-of-law principles would require application of California law to the claims of the Class.

61.     The foregoing conduct, as alleged, constitutes breach of contract made for the benefit of Lyft Drivers under California law.

Third Amended Class Action Complaint
Case No. 3:16-cv-02558-VC

62.     Lyft entered into contracts with Riders whereby Riders agreed to pay the Prime Time Premium "to your Driver."  Riders clearly demonstrated their intention for the Prime Time payment to go to the Driver by clicking a button in the Lyft App that explicitly asked Riders to confirm that they would make an additional Prime Time payment "to your Driver."

63.     Lyft had a policy and practice of failing and refusing to pay Plaintiffs and class members the full amount of the Prime Time Premium, as intended by Riders, and thus breached and continues breaching its Prime Time ride contracts with Riders made for the benefit of Lyft Drivers.

64.     Plaintiffs and the Class members suffered damages resulting from Lyft's breach of contract, including lost portions of the Prime Time Premium, interest, and such relief as the Court deems just and proper.

65.     Plaintiffs, on behalf of themselves and the  Class members, seek damages in the amount of the respective unpaid portions of Prime Time payments owed them, attorneys' fees and costs, and such other legal and equitable relief as the Court deems just and proper.

### THIRD CLAIM FOR RELIEF
### (Unfair Business Practices, Cal. Bus. & Prof. Code § 17200,
### Brought by Plaintiffs on Behalf of Themselves and the Class)

66.     Plaintiffs, on behalf of themselves and all members of the Class, reallege and incorporate by reference all other paragraphs as if they were set forth again herein.

67.     By taking, receiving, and/or retaining a portion of Prime Time Premiums, Lyft committed unlawful, unfair, deceptive, and/or fraudulent acts as defined by the UCL.

a.     Lyft engaged in fraudulent acts by retaining a portion of the Prime Time Premiums, because Lyft communicated to Riders that Prime Time Premiums would be paid to Drivers, when in reality it was taking 20% for itself.  This fraudulent misrepresentation disincentivized Riders from tipping Drivers.  Drivers, who access the Lyft platform through "Driver mode," are not privy to the information that Riders receive in "Passenger mode."  Therefore, Drivers were unaware of this fraudulent misrepresentation.  Plaintiffs would have driven less during Prime Time had they known that Lyft was misrepresenting to Riders that the Prime Time Premium goes to the Drivers.

b.      Lyft engaged in unlawful acts by retaining a portion of the Prime Time Premiums, because such acts constitute breach of contract and fraudulent misrepresentation as described in paragraph 6.

c.      Lyft engaged in unfair acts by retaining of a portion of the Prime Time Premiums, because such acts are contrary to public policy.

68.     As a result of this unlawful, unfair, and/or fraudulent business practice, Lyft reaped unfair benefits and illegal profits at the expense of Plaintiffs and Class Members.  Lyft must disgorge these ill-gotten gains and restore to Plaintiffs and Class Members all wrongfully withheld portions of the Prime Time Premiums.  Lyft's actions deprived Plaintiffs and each member of the Class of portions of their Prime Time Premiums; consequently, they are entitled to restitution in the amount of the portions of their Prime Time Premiums that Lyft withheld from the Drivers.

**FOURTH CLAIM FOR RELIEF**
**(Unlawful, Unfair, or Fraudulent Business Practices that Violate the California Labor Code, Cal. Bus. & Prof. Code § 17200,**
**Brought by Plaintiffs on Behalf of Themselves and the Class)**

69.     Plaintiffs, on behalf of themselves and the Class, reallege and incorporate by reference all other paragraphs as if they were set forth again herein.

70.     At all relevant times, Lyft has been an employer, and Plaintiffs and Class members were, are, or will be employees under California law entitled to the protections of the California Labor Code.

71.     California Labor Code § 351 prohibits employers from taking gratuities paid to or left for an employee.  Section 351 provides, in full:

> No employer or agent shall collect, take, or receive any gratuity or a part thereof that is paid, given to, or left for an employee by a patron, or deduct any amount from wages due an employee on account of a gratuity, or require an employee to credit the amount, or any part thereof, of a gratuity against and as a part of the wages due the employee from the employer. Every gratuity is hereby declared to be the sole property of the employee or employees to whom it was paid, given, or left for. An employer that permits patrons to pay gratuities by credit card shall pay the employees the full amount of the gratuity that the patron indicated on the credit card slip, without any deductions for any credit card payment processing fees or costs that may be charged to the employer by the credit card company. Payment of gratuities made by patrons using credit cards shall be made to the employees not later than the next regular payday following the date the patron authorized the credit card payment.

72.     California Labor Code § 2802 provides for the reimbursement of Plaintiffs' and Class Members' expenses incurred while carrying out their employment or to comply with Lyft requirements.

73.     California Labor Code §§ 1182.12, 1194, 1194.2, 1197, 1197.1, 1199, and Wage Order 9 protect Plaintiffs' and Class Members' right to earn the minimum wage and provide for damages and punishment for violations of that right.

74.     California Labor Code §§ 510, 1194, 1198, and Wage Order 9 provides for compensation with overtime pay for time worked over eight hours in a day or 40 hours in a week.

75.     California Wage Order 9 provides for reporting time pay for employees who report for work and are not put to work or are furnished less than half of their usual scheduled day's work.

76.     California Labor Code §§ 226, 353, and 1174 provide requirements for properly itemized wage statements and payroll recordkeeping, including gratuities.

77.     Lyft's conduct, as alleged, violates the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, which prohibits, *inter alia*, unfair competition in the form of any unlawful, unfair, deceptive, or fraudulent business practices.  Plaintiffs bring this cause of action individually and as representatives of all others subject to Lyft's unlawful acts and practices.

78.     By taking, receiving, and/or retaining a portion of Prime Time Premiums; failing to pay Drivers' work-related expenses, overtime, minimum wage, and reporting pay; and violating requirements for wage statements and payroll records, Lyft committed unlawful, unfair, deceptive, and/or fraudulent acts as defined by the UCL.

a.     Lyft's practices, as alleged, constitute unlawful acts because such acts violate the California Labor Code sections detailed above and constitute conversion.

b.     Lyft's practices, as alleged, constitute unfair acts because such acts are contrary to public policy.

c.     Lyft's practices, as alleged, constitute fraudulent acts because Lyft communicated to Drivers and Riders that Lyft's business practices were worker-friendly when they were not, including, specifically, that the Prime Time Premiums would be paid to Drivers, when in reality Lyft was taking 20% for itself.  This fraudulent misrepresentation disincentivized Riders from tipping

Drivers.  Drivers, who access the Lyft platform through "Driver mode," are not privy to the information that Riders receive in "Passenger mode."  Therefore, Drivers were unaware of this fraudulent misrepresentation.  Plaintiffs would have driven less during Prime Time had they known that Lyft was misrepresenting to Riders that the Prime Time Premium goes to the Drivers.

79.     As a result of this unlawful and/or unfair business practice, Lyft reaped unfair benefits and illegal profits at the expense of Plaintiffs and Class Members.  Lyft must disgorge these ill-gotten gains and restore to Plaintiffs and Class Members all wrongfully withheld portions of the Prime Time Premiums and expense reimbursement, overtime, minimum wage, and reporting pay owed.  Lyft's actions deprived Plaintiffs and each member of the Class portions of their Prime Time Premiums and their expenses and full pay; consequently, they are entitled to restitution in the amount of the portions of their Prime Time Premiums, expenses, and pay that Lyft withheld from the Drivers.

**FIFTH CLAIM FOR RELIEF**
**(California Expense Reimbursement Claim, Cal. Labor Code § 2802,**
**Brought by Plaintiffs on Behalf of Themselves and the Class)**

80.     Plaintiffs, on behalf of themselves and all members of the Class, reallege and incorporate by reference all other paragraphs as if they were set forth again herein.

81.     At all relevant times, Lyft has been an employer, and Plaintiffs and Class members were, are, or will be employees under California law entitled to the protections of the California Labor Code.

82.     The foregoing conduct, as alleged, constitutes a violation of California Labor Code §2802, which provides for the reimbursement of employee expenses incurred while carrying out their employment or to comply with employer requirements.

83.     Lyft Drivers, including Plaintiffs, incur expenses that include mileage costs, cell phone service to maintain required email and/or text message contact with Lyft, car cleaning and repair to comply with Lyft requirements, and water, snacks, and/or other supplies for Riders, among other expenses.

84.     Lyft had a policy and practice of failing and refusing to reimburse Plaintiffs and Class Members for all of their work-related expenses and thus violated and continues to violate Labor Code § 2802.

85.     Plaintiffs, on behalf of themselves and the Class Members, seek the amount of the respective unpaid expenses owed them, interest, attorneys' fees and costs, and such other legal and equitable relief as the Court deems just and proper.

## SIXTH CLAIM FOR RELIEF
### (California Overtime Claim, Cal. Labor Code §§ 510, 1194, 1198, and Wage Order 9, Brought by Plaintiffs on Behalf of Themselves and the Class)

86.     Plaintiffs, on behalf of themselves and all members of the Class, reallege and incorporate by reference all other paragraphs as if they were set forth again herein.

87.     At all relevant times, Lyft has been an employer, and Plaintiffs and Class members were, are, or will be employees under California law entitled to the protections of the California Labor Code.

88.     The foregoing conduct, as alleged, constitutes a violation of California Labor Code §§ 510, 1194, 1198, and Wage Order 9, which provide overtime pay for time worked over eight hours in a day or over 40 hours in a week.

89.     Although Plaintiffs and an identifiable portion of Class Members periodically worked more than eight hours in a day or 40 hours in a week, Lyft had a policy and practice of failing and refusing to pay them overtime and thus violated and continues to violate the above-referenced overtime provisions of the Labor Code.

90.     For example, Alex Zamora worked more than 40 hours during the weeks of June 1-7, 2015, July 6-12, 2015, July 13-19, 2015, July 20-26, 2015, July 27-August 2, 2015 August 10-16, 2015, amongst other weeks, without receiving any overtime pay.

91.     Rayshon Clark worked more than 40 hours during the week of February 1-7, 2016, amongst other weeks, without receiving any overtime pay.

92.     Plaintiffs, on behalf of themselves and the Class Members, seek the amount of the respective unpaid wages owed them, interest, attorneys' fees and costs, and such other legal and equitable relief as the Court deems just and proper.

### SEVENTH CLAIM FOR RELIEF
### (California Minimum Wage Claim, Cal. Labor Code
### §§ 1182.12, 1194, 1194.2, 1197, 1197.1, 1199, and Wage Order 9,
### Brought by Plaintiffs on Behalf of Themselves and the Class)

93. Plaintiffs, on behalf of themselves and all members of the Class, reallege and incorporate by reference all other paragraphs as if they were set forth again herein.

94. At all relevant times, Lyft has been an employer, and Plaintiffs and Class members were, are, or will be employees under California law entitled to the protections of the California Labor Code.

95. The foregoing conduct, as alleged, constitutes a violation of California Labor Code §§ 1182.12, 1194, 1194.2, 1197, 1197.1, 1199, and Wage Order 9, which protect Plaintiffs' and Class Members' right to earn a minimum wage and provide for damages and punishment for violations of that right.

96. Although Plaintiffs and an identifiable portion of Class Members periodically did not earn minimum wage, Lyft had a policy and practice of failing and refusing to pay them minimum wage for all hours worked and thus violated and continues to violate the above-referenced minimum wage protections of the Labor Code.

97. Plaintiffs, on behalf of themselves and the Class Members, seek the amount of the respective unpaid wages owed them, interest, liquidated damages, attorneys' fees and costs, and such other legal and equitable relief as the Court deems just and proper.

### EIGHTH CLAIM FOR RELIEF
### (California Wage Statement Claim, Cal. Labor Code § 226,
### Brought by Plaintiffs on Behalf of Themselves and the Class)

98. Plaintiffs, on behalf of themselves and all members of the Class, reallege and incorporate by reference all other paragraphs as if they were set forth again herein.

99. At all relevant times, Lyft has been an employer, and Plaintiffs and Class members were, are, or will be employees under California law entitled to the protections of the California Labor Code.

100. The foregoing conduct, as alleged, constitutes a violation of California Labor Code § 226, which provides requirements for properly itemized wage statements.

101. Lyft's wage statements do not clearly itemize hours worked, an hourly wage, overtime, or earnings in a way that Drivers can readily identify whether they received all applicable bonuses,

premiums, and other tips and pay for which they were eligible under Lyft promotions, programs, or policies.  Lyft thus violated and continues to violate California Labor Code § 226.

102.    Plaintiffs, on behalf of themselves and the Class Members, seek to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurred and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not to exceed an aggregate penalty of four thousand dollars ($4,000), as well as costs and attorney's fees.

**NINTH CLAIM FOR RELIEF**
**(California PAGA Claim, Cal. Labor Code §§ 2698-2699.5,**
**Brought by Plaintiffs on Behalf of Themselves and the Class)**

103.    Plaintiffs, on behalf of themselves and all members of the Class, reallege and incorporate by reference all other paragraphs as if they were set forth again herein.

104.    Under PAGA, an aggrieved employee, on behalf of him- or herself and other current or former employees as well as the general public, may bring a representative action as a private attorney general to recover penalties for an employer's violations of the California Labor Code.  These civil penalties are in addition to any other relief available under the Cal. Labor Code, and must be allocated 75% to California's Labor and Workforce Development Agency and 25% to the aggrieved employee, pursuant to Cal. Labor Code § 2699.

105.    At all relevant times, Lyft has been an employer, and Plaintiffs and  Class members were, are, or will be employees under California law.

106.    Lyft's unlawful activities detailed in previous paragraphs constitute violations of the Labor Code actionable under PAGA.

107.    Moreover, Lyft fails to record all hours Drivers actually work and instead records only those hours a Driver spends engaged in providing a ride.  Lyft also fails to accurately record daily wages, piece rates and gratuities.  In these ways Lyft violated and continues to violate the Cal. Labor Code §§ 353, 1174, 1174.5 which provide requirements for keeping accurate payroll records and records of all gratuities received by the employer, whether received directly from the employee or indirectly.

108.    The Plaintiffs allege, on behalf of themselves and the Class, as well as the general public, that Lyft has violated all of the Cal. Labor Code sections previously described in this Complaint.  These

violations entitle Plaintiffs, as private attorneys general, to recover the applicable statutory civil

penalties on their own behalf, on behalf of all aggrieved employees, and on behalf of the general public.

109.    Cal. Labor Code § 2699(a), which is part of PAGA, provides in pertinent part:

Notwithstanding any other provision of law, any provision of this code that provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency or any of its departments, divisions, commissions, boards, agencies, or employees, for a violation of this code, may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself and other current or former employees pursuant to the procedures specified in § 2699.3.

110.    Cal. Labor Code § 2699(f), which is part of PAGA, provides in pertinent part:

For all provisions of this code except those for which a civil penalty is specifically provided, there is established a civil penalty for a violation of these provisions, as follows: … (2) If, at the time of the alleged violation, the person employs one or more employees, the civil penalty is one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation.

111.    Plaintiffs are entitled to civil penalties, to be paid by Lyft and allocated as appropriate,

pursuant to Cal. Labor Code § 2699(f) for Lyft's violation of Cal. Labor Code sections for which a civil

penalty is not already specifically provided.

112.    On November 18, 2016, Plaintiffs provided written notice by certified mail to the

California Labor & Workforce Development Agency ("LWDA") and to Lyft of the legal claims and

theories of this case, contemporaneous with the filing of the Complaint in this action.

113.    Under PAGA, the Plaintiffs and the State of California are entitled to recover the

maximum civil penalties permitted by law for the violations of the Cal. Labor Code as alleged in this

Complaint.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs on behalf of themselves and all class members pray for relief as

follows:

A.    Certification of the class;

B.    Designation of Plaintiffs as Representatives of the class;

C.    Designation of Plaintiffs' counsel of record as Class Counsel for the class;

Third Amended Class Action Complaint
Case No. 3:16-cv-02558-VC

1    D.    A declaratory judgment that the practices complained of herein are unlawful under state

2  law;

3    E.    An injunction against Lyft and its officers, agents, successors, employees,

4  representatives, and any and all persons acting in concert with it, as provided by law, from engaging in

5  each of the unlawful practices, policies, and patterns set forth herein;

6    F.    Appropriate statutory penalties;

7    G.    An award of damages and restitution to be paid by Lyft according to proof;

8    H.    Pre-judgment and post-judgment interest, as provided by law;

9    I.    Such other injunctive and equitable relief as the Court may deem just and proper;

10    J.    Attorneys' fees and costs of suit, including expert fees and costs; and

11    K.    Appropriate service payments to Plaintiffs for their service as Class representatives.

12                              **<u>DEMAND FOR JURY TRIAL</u>**

13  Plaintiffs hereby demand a jury trial on all causes of action and claims with respect to which they

14  have a right to jury trial.

15  Dated:  November 29, 2017              Respectfully submitted,

16                              By:  */s/ Jahan C. Sagafi*

17                                   Jahan C. Sagafi

18                              Jahan C. Sagafi (Cal. Bar No. 227887)
                               jsagafi@outtengolden.com
19                              Relic Sun (Cal. Bar No. 306701)
                               rsun@outtengolden.com
20                              OUTTEN & GOLDEN LLP
                               One Embarcadero Center, 38th Floor
21                              San Francisco, CA 94111
                               Telephone:  (415) 638-8800
22                              Facsimile:  (415) 638-8810

23

24

25

26

27

28

1

Rachel Bien (Cal. Bar No. 315886)
rmb@outtengolden.com

2

Michael J. Scimone (admitted *pro hac vice*)
mscimone@outtengolden.com

3

685 Third Avenue, 25th Floor

4

New York, NY 10017
Telephone:  (212) 245-1000

5

Facsimile:  (646) 509-2060

6

*Counsel for Plaintiffs, Aggrieved Employees,*
*and Proposed Class Members*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Third Amended Class Action Complaint
Case No. 3:16-cv-02558-VC

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 1, 2017, I electronically filed the forgoing papers with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.

*/s/ Jahan C. Sagafi*
jsagafi@outtengolden.com