Jahan C. Sagafi (Cal. Bar No. 224887)
jsagafi@outtengolden.com
Relic Sun (Cal. Bar No. 306701)
rsun@outtengolden.com
OUTTEN & GOLDEN LLP
One Embarcadero Center, 38th Floor
San Francisco, California  94111
Telephone:  (415) 638-8800
Facsimile:  (415) 638-8810

Rachel Bien (Cal. Bar No. 315886)
rmb@outtengolden.com
Michael J. Scimone (admitted *pro hac vice*)
mscimone@outtengolden.com
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, New York  10017
Telephone:  (212) 245-1000
Facsimile:  (646) 509-2060

*Attorneys for Plaintiffs and Proposed Class Members*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| ALEX ZAMORA and RAYSHON CLARK, individually and on behalf of all other similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>LYFT, INC.,<br><br>Defendant. | Case No.          3:16-cv-02558-VC<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, CONDITIONAL CERTIFICATION OF CLASS, APPROVAL OF CLASS NOTICE, AND SETTING OF FINAL APPROVAL HEARING**<br><br>Hearing Date: May 3, 2018<br>Time:             10:00 a.m.<br>Courtroom:    4 – 17th Floor<br>Judge:           The Honorable Vince G. Chhabria |

## NOTICE OF UNOPPOSED MOTION

To the Clerk of Court and all interested parties:

PLEASE TAKE NOTICE THAT on May 3, 2018, at 10:00 a.m., or as soon thereafter as counsel may be heard, in Courtroom 4 of this Court, located at 450 Golden Gate Avenue, 17th Floor, San Francisco, California 94102, before the Honorable Vince Chhabria, Plaintiffs Alex Zamora and Rayshon Clark, hereby do and will move the Court to: (1) conditionally certify a settlement class; (2) preliminarily approve the parties' proposed class action settlement (the "Settlement"); (3) appoint Plaintiffs as the Class Representatives, their counsel as Class Counsel, and Rust Consulting, Inc., as Settlement Administrator; (4) approve the forms of notice to the class; and (5) schedule a hearing on the final approval of the Settlement.

Plaintiffs make this unopposed motion on the grounds that the Settlement is fair, adequate and reasonable and within the range of possible final approval.

This motion is based upon this Notice of Motion for Preliminary Approval of Class Action Settlement, Conditional Certification of Class, Approval of Class Notice, and Setting of Final Approval Hearing and the following Memorandum; the accompanying Declaration of Jahan C. Sagafi; and proposed form of Order: (1) Preliminarily Approving Proposed Settlement; (2) Conditionally Certifying Settlement Class; (3) Appointing Class Representatives, Class Counsel, and Settlement Administrator; (4) Approving Forms of Notice to Class of Settlement, Class Member Settlement Information Sheet; and (5) Setting Hearing for Final Approval; the Court's record of this action; all matters of which the Court may take notice; and such oral or documentary evidence presented at the hearing on the motion.

## **TABLE OF CONTENTS**

I.     INTRODUCTION ...............................................................................................- 1 -

II.    BACKGROUND ................................................................................................- 1 -

    A.    Factual Background ................................................................................- 1 -

    B.    Procedural Background ...........................................................................- 2 -

        1.    Cotter v. Lyft, Inc. .......................................................................- 2 -

        2.    Zamora v. Lyft, Inc. ....................................................................- 2 -

    C.    Negotiation and Settlement ....................................................................- 3 -

III.   THE PROPOSED SETTLEMENT .....................................................................- 3 -

IV.    ARGUMENT .....................................................................................................- 5 -

    A.    Certification of the Settlement Class Is Proper......................................- 6 -

    B.    The Parties Participated in Arms-Length Negotiations Before an Experienced
        Neutral Mediator. ...................................................................................- 8 -

    C.    The Proposed Settlement Is Fair, Reasonable, and Adequate, and Should Be
        Approved in All Respects. ......................................................................- 8 -

        1.    The Parties Dispute the Strength of Plaintiffs' Case. ................- 9 -

        2.    The Risk, Expense, Complexity, And Delay of Further Litigation Support
            Preliminary Approval...............................................................- 11 -

        3.    Plaintiffs Faced Risk of Losing Rule 23 Certification...............- 12 -

        4.    The Settlement Amount Will Fairly and Adequately Compensate Class
            Members. ..................................................................................- 12 -

        5.    The Extent of Discovery Supports Settlement..........................- 13 -

        6.    Counsel's Experience and Views Support Approval..................- 13 -

    D.    The Proposed Notice Is Adequate.........................................................- 13 -

    E.    The Court's Guidelines Support Granting Preliminary Approval. ........- 14 -

V.     A FINAL APPROVAL HEARING SHOULD BE SCHEDULED........................- 15 -

VI.    CONCLUSION.................................................................................................- 15 -

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                          **Page(s)**

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)................................................................................................................6, 7

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013).......................................................................................................................7

*Carter v. Anderson Merchandisers, LP*,
  No. EDCV 08-00025, 2010 WL 144067 (C.D. Cal. Jan. 7, 2010) ...................................................8

*Class Plaintiffs v. City of Seattle*,
  955 F.2d 1268 (9th Cir. 1992) ......................................................................................................11

*Cotter v. Lyft, Inc.*,
  60 F. Supp. 3d (N.D. Cal. 2015) .....................................................................................................5

*Cotter v. Lyft, Inc.*,
  Case No. 13–cv–04065–VC (N.D. Cal.)...................................................................... *passim*

*Delagarza v. Tesoro Ref. & Mktg. Co.*,
  No. 09-cv-5803, 2011 WL 4017967 (N.D. Cal. Sept. 8, 2011)........................................................7

*Fernandez v. Victoria Secret Stores, LLC*,
  No. CV 06-04149, 2008 WL 8150856 (C.D. Cal. July 21, 2008) .....................................................8

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ..............................................................................................6, 9, 12

*Johnmohammadi v. Bloomingdale's, Inc.*,
  755 F.3d 1072 (9th Cir. 2014) ...........................................................................................4, 5, 9, 12

*Linney v. Cellular Alaska P'ship*,
  151 F.3d 1234 (9th Cir. 1998) ......................................................................................................12

*In re Mego Fin. Corp. Sec. Litig.*,
  213 F.3d 454 (9th Cir. 2000) ........................................................................................................13

*Morris v. Ernst & Young LLP*,
  834 F.3d 975 (9th Cir. 2016) ............................................................................................9, 10, 11, 12

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
  221 F.R.D. 523 (C.D. Cal. 2004).....................................................................................................13

*Nen Thio v. Genji, LLC*,
  14 F. Supp. 3d 1324 (N.D. Cal. 2014) ............................................................................................10

*Tierno v. Rite Aid Corp.*,
    No. 05-cv-02520, 2006 WL 2535056 (N.D. Cal. Aug. 31, 2006) ........................................7

*Tijero v. Aaron Bros., Inc.*,
    301 F.R.D. 314 (N.D. Cal. 2013) ........................................................................................8

*Vasquez v. Coast Valley Roofing, Inc.*,
    266 F.R.D. 482 (E.D. Cal. 2010) ........................................................................................12

**Statutes**

Cal. Lab. Code § 2699(e)(2) ........................................................................................................10

National Labor Relations Act ........................................................................................................11

**Other Authorities**

Economic Policy Institute, http://www.epi.org/publication/the-arbitration-epidemic/#epi-
    toc-10 ........................................................................................................................................11

Fed. R. Civ. P. 23(a)(1) ..................................................................................................................6

Fed. R. Civ. P. 23(a)(2) ..................................................................................................................6

Fed. R. Civ. P. 23(a)(4) ..................................................................................................................6

Fed. R. Civ. P. 23(c)(2)(B) ...........................................................................................................13

Fed. R. Civ. P. 23(g)(1)(A) ............................................................................................................8

http://cand.uscourts.gov/ClassActionSettlementGuidance (last visited Mar. 20, 2018) .........14

http://www.rustconsulting.com/About (last visited Mar. 20, 2018) ..............................................5

**MEMORANDUM IN SUPPORT OF UNOPPOSED MOTION**

## I.    INTRODUCTION

Plaintiffs respectfully seek preliminary approval of a $1,950,000 common fund settlement of this class action, as set forth in the parties' Class Action Settlement Agreement and Release ("Settlement Agreement"), attached as Exhibit 1 to the Declaration of Jahan C. Sagafi ("Sagafi Decl."). Subject to Court approval, the parties have settled all claims relating to Defendant Lyft, Inc.'s ("Lyft") alleged withholding of "Prime Time Premium" payments to Plaintiffs and Class Members. In addition, on or about April 7, 2017, Lyft voluntarily ceased using the language that Plaintiffs criticized as the foundation of their Prime Time Premium claims. The remaining claims (the non-Prime Time Premium-related claims such as mileage reimbursement, overtime pay, minimum wage, and meal and rest breaks claims (*i.e.*, the claims akin to those asserted in *Cotter*) will be dismissed without prejudice.

## II.    BACKGROUND

### A.    Factual Background

The operative complaint alleges the following:

Plaintiffs and Class Members are individuals who work or have worked as drivers for Lyft. *See* Third Amended Class Action Complaint, ECF No. 70, ("TAC") ¶ 14. The Lyft App sets the fare to be paid by the rider, then Lyft pays the driver approximately eighty percent (80%) of the ride fare and keeps approximately twenty percent (20%) of the fare. *Id.*

Starting in December 2013, during periods of high rider demand relative to driver supply, Lyft began charging riders a premium ("Prime Time Premium"), in addition to the base price for a ride. *Id.* ¶ 15. Plaintiffs allege that Lyft told customers that the Prime Time Premium "goes entirely to your driver" or is "for your driver," in order to incentivize drivers to "drive during the busiest times." *Id.* ¶¶ 15-17, 22-27. Plaintiffs further allege that, in approximately August 2014, despite telling customers that the Prime Time Premium goes to the driver (which Plaintiffs allege made it a type of gratuity), Lyft began treating the Premium as a component of the base fare from which it took a commission for itself. *Id.* ¶ 22. Plaintiffs allege that this violated California law because the Premiums belonged to the drivers as a gratuity and/or because customers intended to provide them to drivers, not Lyft. *See id.* ¶ 28. Lyft

1   stopped telling riders that the Premiums were "for your driver" or using words to that effect in or around

2   April 2017.  *Id.* ¶ 27.

3       **B.**    **Procedural Background**

4           **1.**    ***Cotter v. Lyft, Inc.***

5       As the Court is aware, a separate class action involving Lyft drivers was filed in September

6   2013; the plaintiff drivers in *Cotter* alleged that they were misclassified as independent contractors and

7   brought wage and hour and other related claims against Lyft.  *Cotter v. Lyft, Inc.,* Case No. 13–cv–

8   04065–VC (N.D. Cal.) (Chhabria, J.).  This Court granted final approval of the settlement in *Cotter* on

9   March 16, 2017.  *Cotter v. Lyft, Inc*., ECF No. 310.

10          **2.**    ***Zamora v. Lyft, Inc.***

11      Plaintiffs filed this lawsuit on May 11, 2016, alleging only Prime Time Premium-related claims.

12  Shortly thereafter, on May 19, 2016, Plaintiffs sought to intervene in *Cotter* on the ground that the

13  *Cotter* settlement purported to release the Prime Time Premium claims without providing any relief in

14  exchange for it.  *Cotter*, ECF No. 213.

15      On June 23, 2016, the Court approved the *Cotter* settlement, rejecting the *Zamora* Plaintiffs'

16  arguments.  In rejecting the *Zamora* Plaintiffs' arguments, the Court explained that "[b]ased on the

17  evidence currently in the record, the new gratuity claims asserted by the *Zamora* plaintiffs do not seem

18  very strong." 193 F. Supp. 3d 1030, 1038 (N.D. Cal. 2016).  The Court viewed the *Zamora* Plaintiffs'

19  theory as "questionable" and held that "[t]his makes the [*Zamora*] Prime Time gratuity claims far

20  weaker than the gratuity claim asserted by the *Uber* drivers in *O'Connor*."  *Id.* at 1039.  But the Court

21  also held that the *Cotter* settlement would not preclude the *Zamora* Plaintiffs from pursuing Prime Time

22  Premium claims under California's Unfair Business § 17200 and/or common law theories.  *Id.* at 1039-

23  40.

24      On September 1, 2016, Lyft moved to dismiss several claims alleged in *Zamora*.  This Court

25  maintained many of the claims and granted Plaintiffs leave to replead others.  *See* ECF No. 40.  In

26

27

28

1   November 2017, Lyft moved to strike all claims subject to arbitration, which Plaintiffs opposed,[1] *see*

2   ECF Nos. 66, 72, 77; and to strike the nationwide claims.  *See* ECF No. 64.  Plaintiffs subsequently

3   agreed to dismiss the nationwide claims and, on December 1, 2017, the Court approved a stipulation

4   under which Lyft withdrew its motion to strike the nationwide claims.  *See* ECF Nos. 68, 68-1.

5   Plaintiffs then filed a Third Amended Complaint limiting the proposed class to drivers who worked in

6   California.  *See* ECF No. 69.

7             **C.     Negotiation and Settlement**

8             In addition to dispositive motion practice, the parties engaged in extensive formal and informal

9   discovery, including the review and exchange of policy documents, emails, data, and other documents

10   relating to the Prime Time Premium claims.  Sagafi Decl. ¶ 17.  The parties subsequently agreed to

11   engage the assistance of an experienced mediator, Mark Rudy of Rudy, Exelrod, Zieff & Lowe LLP, to

12   attempt to resolve the claims and exchanged additional data, detailed mediation statements and damages

13   calculations.  *Id*. ¶ 22.  The parties participated in an all-day mediation with Mr. Rudy on February 1,

14   2017.  *Id*. ¶ 20.  The parties were unable to reach a resolution and continued to negotiate with the

15   assistance of Mr. Rudy for several months while litigation proceeded.  *Id.*  The terms of the parties'

16   agreement following those arm's length negotiations are contained in the Settlement Agreement, and are

17   summarized below.

18   **III.    THE PROPOSED SETTLEMENT**

19             The Settlement Class[2] comprises all Drivers who gave at least one Prime Time Ride in California

20   during the Settlement Class period of August 18, 2014 to April 7, 2017.  Sagafi Decl. Ex. 1 (Settlement

21   Agreement), ¶¶ 21 (qq), (ss).  There are approximately 245,975 Class Members.  Sagafi Decl. ¶ 15.

22             The $1,950,000 Settlement Amount will cover: (a) Class Member payments; (b) $100,000 for

23   PAGA penalties, with 75% paid to the California Labor and Workforce Development Agency (the

24   LWDA); (c) two Named Plaintiff Service Awards of up to $10,000 each; (d) Class Counsel's attorneys'

25

26   [1] The Court agreed to continue the hearing with regard to this motion pending the outcome of the
    parties' settlement negotiations.  *See* ECF No. 79.

27   [2] The use of capitalized terms in this Memorandum is consistent with those used in the Settlement

28   Agreement and are defined therein.  *See* Sagafi Decl. Ex. 1 (Settlement Agreement).

fees of up to one-third of the Settlement Amount ($650,000); (e) litigation costs and expenses (which are approximately $17,000 to date); and (f) settlement administration costs expected to be $190,000. *Id.* ¶¶ 21(cc), 33, 37-38. The "Net Settlement Fund" is defined as the Settlement Amount minus items (b)–(f)—i.e., the amount allocated for Class Member payments. *Id.* ¶ 22(x).

To receive a Settlement Payment, a Class Member must timely submit a Claim Form, must not have submitted a request for exclusion, and must be eligible for a payment under the Plan of Allocation. Each Class Member who satisfies these criteria is an Authorized Claimant. *Id.* ¶ 40. The Settlement Administrator will calculate the number of points to which each Authorized Claimant is entitled based on the amount of unrefunded commissions he or she earned for Prime Time Rides during various phases of the class period, as well as the total number of Rides driven. *Id.* ¶¶ 41-43.

The Plan of Allocation provides:

1. Six hundred (600) points for each dollar of unrefunded commissions on Prime Time Rides the Authorized Claimant gave from the beginning of the Settlement Class Period through March 16, 2015;

2. Two hundred (200) points for each dollar of unrefunded commissions on Prime Time Rides the Authorized Claimant gave from March 17, 2015 through October 30, 2016; and

3. One hundred (100) points for each dollar of unrefunded commissions on Prime Time Rides the Authorized Claimant gave from October 31, 2016 through April 7, 2017.

*Id.* ¶ 43. For each Authorized Claimant who gave: (1) 400 to 999 or more Rides during the Settlement Class period, the calculated points are doubled (*i.e.*, multiplied by 2); (2) 1,000 or more Rides during the Settlement Class period, the calculated points are tripled (*i.e.*, multiplied by 3). *Id.* ¶ 44.

Class Members earn more points during the first time period (up through March 16, 2015) because Plaintiffs allege that the wording and placement of Prime Time Premium language on riders' Apps during this period makes the Prime Time Premium-related claims accruing in this period stronger than those accruing in later periods. Sagafi Decl. ¶ 27. Class members earn fewer points during the third time period (starting October 31, 2016) because on September 30, 2016, Lyft changed its arbitration agreement to allow drivers thirty days to opt out of arbitrating "Driver Claims," which the Lyft Terms of Service Agreement defines as including claims related to Lyft's charging of commissions

on fares.  Thus, the allocation for this third period reflects the significantly greater litigation risk of these claims.  *Id.*; *see Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1077 (9th Cir. 2014).  Finally, the multiplier for drivers who provided substantially more rides reflects the greater strength of their misclassification claims vis-à-vis drivers who provided fewer rides, a factor affecting several of Plaintiffs' claims.  *Id.*; *see Cotter v. Lyft, Inc.*, 60 F. Supp. 3d, 1607, 1081 (N.D. Cal. 2015).

The determination of each Authorized Claimant's number of Prime Time Rides is based on the relevant records that Lyft is able to identify following a good-faith inquiry, and Lyft will make a diligent effort to supply the records to the Settlement Administrator in a standard electronic format.  Sagafi Decl. Ex. 1 (Settlement Agreement) ¶ 45.  Following the award of points to all Authorized Claimants, each Authorized Claimant's points shall be divided by the sum of the points awarded to the Authorized Claimants as a whole, and the resulting fraction shall be multiplied by the Net Settlement Fund.  *Id.* ¶ 46.  The product of this calculation is the Settlement Payment that each Authorized Claimant shall receive.  *Id.*

The Settlement Administrator has estimated its fees and costs will be $190,000.  *Id.* ¶ 21(y).  To the extent this amount is not sufficient to administer the settlement because of unanticipated costs, Plaintiffs will seek the Court's approval to allocate an additional amount from the Net Settlement Fund. *Id.*  Plaintiffs sought bids from several Settlement Administrators before selecting Rust Consulting, Inc. ("Rust"), a claims administrator with significant expertise and experience.[3]  Sagafi Decl. ¶ 29.  Rust's bid was substantially lower than its competitors'.  *Id.*

## IV.    ARGUMENT

At the preliminary approval stage, "district courts should review class action settlements just as carefully . . . as they do at the final stage."  *Cotter*, 193 F. Supp. at 1037.  The inquiry at preliminary approval "should be whether the settlement is 'fair, reasonable, and adequate.'."  *Id.*

---

[3] *See* http://www.rustconsulting.com/About (last visited Mar. 20, 2018).

1

## A.    Certification of the Settlement Class Is Proper.

2

For settlement purposes only, the parties agree to conditional certification of the Settlement

3

Class.  "The validity of use of a temporary settlement class is not usually questioned."  Alba Conte &

4

Herbert B. Newberg, 4 Newberg on Class Actions § 11:22 (4th Ed. 2002); Manual for Complex

5

Litigation, Fourth, § 21.612.

6

All of the Rule 23 requirements are met.

7

First, numerosity is met because joinder of the Class Members would be impractical.  Fed. R.

8

Civ. P. 23(a)(1).

9

Second, commonality is met because "there are questions of law or fact common to the class."

10

Fed. R. Civ. P. 23(a)(2).  The Ninth Circuit "construe[s]" this requirement "permissively."  *Hanlon v.*

11

*Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).  Even though proposed class members "may

12

possess different avenues of redress," so long as "their claims stem from the same source," there is

13

sufficient commonality "to satisfy the minimal requirements of Rule 23(a)(2)."  *Id.* at 1019-20.  Here,

14

common questions include: (1) whether Prime Time Premiums are gratuities under California law; (2)

15

whether Lyft's drivers are employees or independent contractors; and (3) whether Lyft breached a

16

contract with riders that was made for the benefit of the drivers by accepting a portion of the Prime

17

Time Premiums.

18

Third, typicality is satisfied.  Typicality is established if "representative claims are . . .

19

reasonably co-extensive with those of absent class members; they need not be substantially identical."

20

*Hanlon*, 150 F.3d at 1020.  The Class Representatives and Class Members assert the same claims, so

21

typicality is readily satisfied.

22

Fourth, Plaintiffs have fairly and adequately protected the interests of the Class, and will

23

continue to do so.  Fed. R. Civ. P. 23(a)(4).  The adequacy requirement is met where the class

24

representative: (1) has common, and not antagonistic, interests with unnamed class members; and (2)

25

will vigorously prosecute the interests of the class through qualified counsel.  *Amchem Prods., Inc. v.*

26

*Windsor*, 521 U.S. 591, 625 (1997); *Hanlon*, 150 F.3d at 1020.  Here, each Class Representative shares a

27

common interest with the Class Members they seek to represent, in that they all suffered the same type

28

of injury, and they share an interest in vigorous prosecution.  The Class Representatives have retained adequate Class Counsel, who are highly qualified in terms of experience and expertise.  Sagafi Decl. ¶¶ 4-5.

Fifth, the predominance test of Rule 23(b)(3) is met because the proposed Class is sufficiently cohesive to warrant adjudication on a classwide basis.  *Amchem*, 521 U.S. at 623.  Importantly, predominance does not require "that each element of [a plaintiff's] claim [is] susceptible to classwide proof."  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (internal quotation marks and citation omitted).  Common questions may predominate "even though certain class members' circumstances var[y] and some of the defendant's practices would have to be proven by anecdotal testimony."  *Delagarza v. Tesoro Ref. & Mktg. Co.*, No. 09-cv-5803, 2011 WL 4017967, at *12 (N.D. Cal. Sept. 8, 2011).  Here, common issues predominate because Plaintiffs and Class Members were subject to Lyft's policy or practice of accepting a portion of Prime Time Premiums and allegedly telling riders that the Premium was for drivers.  These facts, and the legal questions they raise, predominate over any issues that affect class members individually.

Sixth, a class action is superior to individual suits, especially for settlement purposes.  *Amchem*, 521 U.S. at 615.  This requirement is satisfied because "there is no indication that class members seek to individually control their cases, that individual litigation is already pending in other forums, or that this particular forum is undesirable for any reason."  *Tierno v. Rite Aid Corp.*, No. 05-cv-02520, 2006 WL 2535056, at *11 (N.D. Cal. Aug. 31, 2006).  Class Members, who drive or have driven for Lyft, likely lack the resources and certainly lack the incentives to secure experienced, qualified counsel, or to see litigation through to completion on their own, individually.  Few individuals who drive for Lyft have the ability to invest the type of money such litigation requires and are willing to take on the scores of hours of time and stress inherent in litigation for a chance to recover the amount of lost pay at issue.  In addition, individual lawsuits from thousands of individuals would be wasteful and inefficient for both the court system and Lyft.  *See, e.g.*, *Whiteway*, 2006 WL 2642528 at *11.  Accordingly, certification is superior to any other method of resolving this matter, as it will promote economy, expediency, and efficiency.

Finally, the Court should appoint Class Counsel pursuant to Rule 23(g).  Rule 23(g) requires a court that certifies a class to appoint class counsel, taking into consideration four factors: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.  Fed. R. Civ. P. 23(g)(1)(A).  Plaintiffs' Counsel satisfy these criteria.  Plaintiffs' Counsel are experienced class action and wage and hour attorneys, have the resources to prosecute the action to completion, and used their expertise to obtain a positive result for the class.  Sagafi Decl. ¶¶ 4-5.

For these reasons, the proposed Class should be certified for settlement purposes.

**B.      The Parties Participated in Arms-Length Negotiations Before an Experienced Neutral Mediator.**

The parties agreed to the Settlement Amount after a day-long mediation and several months of arms'-length negotiations facilitated by an experienced and well-respected private mediator.  A settlement "in good faith after a well-informed arms-length negotiation" is presumed to be fair. *Fernandez v. Victoria Secret Stores, LLC*, No. CV 06-04149, 2008 WL 8150856, at *4 (C.D. Cal. July 21, 2008); *Tijero v. Aaron Bros., Inc.*, 301 F.R.D. 314, 324-25 (N.D. Cal. 2013) (holding that where settlement reached after parties participated in private mediation, settlement was appropriate for final approval); *Carter v. Anderson Merchandisers, LP*, No. EDCV 08-00025, 2010 WL 144067, at *6 (C.D. Cal. Jan. 7, 2010) (recognizing importance of experienced mediator).  Here, Mr. Rudy's oversight of the mediation is extremely telling; Mr. Rudy has a strong reputation for excellence, diligence, and care in settling complex employment class actions.  Sagafi Decl. ¶ 21.

**C.      The Proposed Settlement Is Fair, Reasonable, and Adequate, and Should Be Approved in All Respects.**

The Ninth Circuit has articulated several factors for assessing the adequacy of settlement proposals:

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the

1    proceedings; the experience and views of counsel; the presence of a governmental

2    participant; and the reaction of the class members to the proposed settlement.

3    *Hanlon,* 150 F.3d at 1026.  Here, those factors weigh heavily in favor of preliminary approval.

4                    **1.    *The Parties Dispute the Strength of Plaintiffs' Case.***

5            When courts decide whether to give preliminary approval to a class action settlement, "perhaps

6    the most important factor to consider is 'plaintiffs' expected recovery balanced against the value of the

7    settlement offer.'"  *Cotter*, 176 F. Supp. at 935 (citations omitted).  Courts should also evaluate "the

8    relative strengths and weaknesses of the plaintiffs' case; it may be reasonable to settle a weak claim for

9    relatively little, while it is not reasonable to settle a strong claim for the same amount."  *Id.*

10           While Plaintiffs believe that they can prevail on all issues, to recover full damages, they would

11   have to surmount the following hurdles – loss on any one would eliminate or significantly reduce the

12   recovery: (1) Rule 23 class certification; (2) Lyft's motion to strike claims subject to arbitration or a

13   post-class certification motion to compel arbitration; (3) summary judgment on the misclassification

14   question and/or the third-party beneficiary contract or conversion theories; (4) liability at trial; (5)

15   damages showing through expert calculations; and (6) appeal.

16           Arbitrability—whether resolved in Lyft's motion to strike or a subsequent motion to compel

17   arbitration—is a particularly significant hurdle, the importance of which has grown since this case was

18   filed.  Lyft has entered into arbitration agreements with its drivers, which were amended in September

19   2016 to permit drivers to opt out of arbitrating claims based on an alleged employment relationship

20   between Lyft and the driver.  Only a few hundred drivers in California have attempted to do so.  *See*

21   Sagafi Decl., Exh. 1 (Settlement Agreement) ¶ 9.  Even assuming the Supreme Court affirms the Ninth

22   Circuit decision in *Morris v. Ernst & Young LLP*, 834 F.3d 975 (9th Cir. 2016)—which is far from

23   certain—Lyft's opt-out provision has significantly affected the calculus as to whether the claims

24   asserted here are subject to individual arbitration.  *See Johnmohammadi*, 755 F.3d at 1077.

25           Moreover, the *Cotter* release released drivers' employee misclassification claims and claims for

26   PAGA penalties for the period of May 25, 2012 through July 1, 2016.

27

28

- 9 -

1    According to Lyft's data, if Plaintiffs were able to prevail on the Prime Time Premium claims,

2    Lyft would owe approximately $11,515,389 in unrefunded commissions – to all Class Members, most of

3    whom agreed to Lyft's arbitration policy.  Sagafi Decl. ¶ 25.  But this figure must be viewed in light of

4    the hurdles discussed above.  Additionally, the vast majority of this value is recoverable only (a) under a

5    consumer theory, in individual arbitrations, or (b) under an employment theory (also in individual

6    arbitrations, assuming the Supreme Court reverses the Ninth Circuit's *Morris* decision).  Looked at from

7    another perspective, this Court observed that the *Cotter* $27 million settlement was settled for "roughly

8    17 percent" of the "$156 million" exposure, and "it would have been reasonable for the plaintiffs to

9    agree to a much larger discount on the much weaker $10 million [*Zamora*] gratuity claim."  *Cotter*, 193

10   F. Supp. 3d at 1039.  Applying the 17% figure to the total unrefunded commissions would yield a

11   settlement value of $1,957,616, almost exactly the settlement amount proposed herein.

12   The PAGA allocation of $100,000 represents roughly 5% of the total $1,950,000 settlement

13   amount, which is in line with applicable precedent.  *See, e.g.*, *Cotter*, 193 F. Supp. 3d at 1037 ($1

14   million allocated to PAGA penalties for California-only $27 million settlement (*i.e.*, 3.7%)); *Nen Thio v.*

15   *Genji, LLC*, 14 F. Supp. 3d 1324, 1329-30 (N.D. Cal. 2014) ($10,000 allocated to PAGA penalties from

16   $1.25 million settlement (*i.e.*, 1%)).  This slightly greater allocation than other settlements is due to the

17   fact that the PAGA claim likely provides the only route by which Class Members could pursue claims

18   on a collective basis.  However, proving entitlement to all PAGA penalties would be challenging,

19   requiring both a victory on the underlying Labor Code claims and the Court exercising its discretion to

20   award 100% of the penalty for all violations, making a steeper discount for PAGA claims appropriate.

21   *See* Cal. Lab. Code § 2699(e)(2).

22   Given these considerations, Plaintiffs submit that the $1.95 million settlement amount, including

23   the $100,000 PAGA amount, is fair, reasonable, and adequate, and that the Settlement is in the best

24   interest of the Class.

25

26

27

28

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION
SETTLEMENT, NO. 16-cv-02558-VC

**2.**  **The Risk, Expense, Complexity, And Delay of Further Litigation Support Preliminary Approval.**

Settlement now saves Class Members significant risk of no recovery, the cost and burden of individual litigation, and the delay inherent in further litigation and possible appeals.  As detailed above, the litigation is highly complex, both procedurally and substantively, and the Court has already expressed skepticism about the strength of the Prime Time claims.  Absent settlement, the parties would need to conduct substantial additional discovery, including depositions and written discovery of a sampling of Class Members, pre-trial motion practice, expert discovery, and trial preparations.  Once liability had been established on a classwide basis, Class Members would likely be required to testify at individual damages mini-trials.  Further litigation could easily last several more years and investment of hundreds of thousands of dollars more in costs, and a million dollars or more of attorney time.  For these reasons, the law strongly favors settlements, particularly where complex class action litigation is concerned.  *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).

More likely,[4] Class Members would have to pursue individual arbitrations,[5] which typically result in substantively worse outcomes for plaintiffs, especially in employment law cases.[6]  This slanted playing field is in part due to employers' repeat-player advantage when they regularly appear before the same arbitrators,[7] due to the employer's payment of the arbitrator's earnings and the employer's ability to make use of the information asymmetry (different plaintiffs represented by different counsel cannot collaborate due to confidentiality restrictions, but the single defendant knows about all of its own arbitrations).  Lyft would benefit from these advantages in a series of individual arbitrations.

There is a substantial likelihood that the Supreme Court will overrule the Ninth Circuit's decision in *Morris* and hold that the National Labor Relations Act does not forbid mandatory individual

---

[4] The views set forth in this paragraph are Plaintiffs' and are not shared by Defendant.

[5] It appears likely that the Supreme Court will overturn *Morris*, allowing companies to require employees to "consent" to individual arbitration as a condition of employment.

[6] "The arbitration epidemic," Economic Policy Institute, http://www.epi.org/publication/the-arbitration-epidemic/#epi-toc-10, *last visited* March 13, 2018 (quantifying lower chances of prevailing (21% vs. 36% vs. 57%) and lower average damages ($23,548 vs. $143,497 vs. $328,008) between arbitration, federal court, and state court, respectively, in employment cases).

[7] *Id.*

1  arbitration clauses in employment agreements.  Even if the Supreme Court does not reverse *Morris*,

2  Lyft's opt-out provision may protect its arbitration agreement from any NLRA-based challenge.

3  *Johnmohammadi*, 755 F.3d at 1077.  Either way, Lyft's arbitration agreements create significant risk for

4  any further litigation.

5              **3.       *Plaintiffs Faced Risk of Losing Rule 23 Certification.***

6       Plaintiffs face the risk of losing on class certification.  Such rulings are effectively a death knell

7  for workers' wage and hour claims, due to the imbalance between the cost of litigation and the value of a

8  single worker's claim.  Even if there was a strong chance that the Court would certify the

9  misclassification issue, Lyft has argued that certification of the Prime Time Premium claim would not be

10  appropriate because drivers and customers received different messages and had varying understandings

11  about the Prime Time Premiums on their Apps during the class period.  Sagafi Decl. ¶ 24.  In addition,

12  Lyft has argued that the pleaded class cannot be certified for litigation purposes because a large number

13  of class members signed arbitration agreements.  *See* ECF No. 66.  These risks support the

14  reasonableness of the Settlement.

15              **4.       *The Settlement Amount Will Fairly and Adequately Compensate Class***
16                         ***Members.***

17       The settlement amount, as with any settlement, represents a compromise between receiving full

18  damages and penalties on the one hand, and total defeat (including possible imposition of defense costs)

19  on the other.  Indeed, "the very essence of a settlement is compromise, a yielding of absolutes and an

20  abandoning of highest hopes."  *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 489 (E.D. Cal.

21  2010).  "Naturally, the agreement reached normally embodies a compromise; in exchange for the saving

22  of cost and elimination of risk, the Parties each give up something they might have won had they

23  proceeded with litigation."  *Officers for Justice*, 688 F.2d at 624 (citation omitted).  Accordingly, the

24  settlement is not to be judged against a speculative measure of what might have been achieved.  *Linney*

25  *v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998).  In the end, "[s]ettlement is the offspring

26  of compromise; the question we address is not whether the final product could be prettier, smarter or

27

28

snazzier, but whether it is fair, adequate and free from collusion." *Hanlon*, 150 F.3d at 1027. As set forth above, the compromise amount here is fair and adequate.

### 5.    *The Extent of Discovery Supports Settlement.*

Adequate discovery is required to justify settlement. The touchstone of the analysis is whether "the parties have sufficient information to make an informed decision about settlement," including formal and informal discovery. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000). Here, Plaintiffs have thoroughly probed the factual basis for Class Members' claims. Sagafi Decl. ¶¶ 16-17. They interviewed drivers and reviewed thousands of pages of documents and data relevant to the claims. *Id.* ¶ 17. In sum, Plaintiffs engaged in sufficient investigation to support this Settlement.

### 6.    *Counsel's Experience and Views Support Approval.*

"Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) (citations and internal quotations omitted). Plaintiffs' Counsel are experienced attorneys specializing in complex employment class actions. Sagafi Decl. ¶¶ 4-5. Over the past many years, Plaintiffs' Counsel have successfully – and unsuccessfully – litigated many such cases, enabling them to assess Plaintiffs' claims and the Settlement. *Id.*

In these, and all other respects, the Settlement is fair, reasonable, and adequate, falls within the range of possible approval, and is appropriate for preliminary approval and notice to Class Members.

### D.    The Proposed Notice Is Adequate.

The notice here is the "best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B). The proposed Notice and Summary Notice, attached as Exhibits B and C to the Settlement Agreement, are consistent with modern best practices set forth by the Federal Judicial Center (based on examples at www.fjc.gov). The Notice will inform Class Members of, among other things: (1) the nature of this action, the Settlement Class, Class Counsel, and the essential terms of the Settlement; (2) the allocation of the settlement fund, including how Class Members' settlement shares are calculated, plus the requests for Service Payments, Attorneys' Fees and Costs Payment, and the other payments that will be deducted from the Settlement Fund; (3) how to participate in the Settlement and submit a Claim

1  Form; (4) how to opt out of the settlement; (5) how to comment on or object to the Settlement; (6) the

2  final approval process; and (7) how to obtain additional information regarding this action and the

3  Settlement.  The Notice is written in plain English and is organized and formatted so as to be as clear as

4  possible.  The Notice encourages class members to contact the Settlement Administrator with any

5  questions, and provides Class Counsel's and the Settlement Administrator's telephone, mail, e-mail, and

6  web contact information.

7          Notices will be sent to class members via email, unless the email bounces back, in which case

8  the Notice will be sent to the Class Member by mail.  Sagafi Ex. 1 (Settlement Agreement) ¶¶ 55-56.

9  This method was used effectively in the *Cotter* case.  Sagafi Decl. ¶ 28.

10         The parties propose that, under the notice plan outlined above, Class Members will have 60 days

11  to object or opt out, and until the date of the Fairness Hearing to submit a Claim Form.  *See* Sagafi Decl.

12  Ex. 1 (Settlement Agreement) ¶¶ 21(b), 22.

13      **E.      The Court's Guidelines Support Granting Preliminary Approval.**

14         With regard to the recommendations and requirements set forth in the Court's Procedural

15  Guidance for Class Action Settlements that have not already been addressed above,[8] Plaintiffs provide

16  the following additional information:

17      ▪   There is no difference between the Settlement Class and the class proposed in the Third
            Amended Complaint.
18

19      ▪   The claims to be released differ from the claims set out in the operative complaint.  The
            release covers only the Prime Time Premium-related claims – not the non-Prime Time
20          Premium-related claims asserted as part of the Fifth, Sixth, Seventh, and Eighth Claims
            for Relief, which will be dismissed without prejudice.  Sagafi Decl. Ex. 1 (Settlement
21          Agreement) ¶ 21(f) & Ex. D.

22      ▪   Although information on the allocation formula is included in the Notice, it is not
            possible to provide an accurate estimated recovery per Class Member before the parties
23          know how many and which Class Members return claim forms.  Consequently, this
            information was not included in the Notice.
24
        ▪   The total damages exposure is provided above.  The average gross recovery per Class
25          Member is $7.93 ($1,950,000 ÷ 245,975 drivers); assuming the claims rate is the same as
            in *Cotter* (45.5%), the average gross recovery will be approximately $17.42 per Class
26          Member.  Plaintiffs will provide updated information to the Court in their final approval

27  _____

28  [8] http://cand.uscourts.gov/ClassActionSettlementGuidance (last visited Mar. 20, 2018).

papers.

- ▪ The money from uncashed checks will be directed to Legal Aid at Work, a San Francisco-based legal services provider that advocates for workers' employment rights and has a direct and substantial nexus to the interests of the Class.

## V.     A FINAL APPROVAL HEARING SHOULD BE SCHEDULED.

Plaintiffs, after consultation with Lyft, propose that the Court adopt the following schedule for purposes of effectuating the various steps in the settlement approval process described above.

| Event | Proposed Date |
|---|---|
| Preliminary Approval Hearing | Thursday, May 3, 2018, at 10:00 a.m. |
| Entry of Preliminary Approval Order (assumed for purposes of calculating subsequent dates) | May 10, 2018 |
| Lyft to provide class list data to Administrator | May 21, 2018 |
| Notice disseminated by Settlement Administrator | June 25, 2018 |
| Motion for attorneys' fees, costs, and service awards | August 3, 2018 |
| Reminder notices | August 21, 2018 |
| Deadline for exclusions and objections | August 24, 2018 |
| Final approval and fee reply briefs | September 6, 2018 |
| Final Approval Hearing and Deadline for Class Members to submit Claim Forms | Thursday, September 20, 2018, at 10:00 a.m. |

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (1) preliminarily approve the Settlement pursuant to Fed. R. Civ. P. 23; (2) preliminarily certify the proposed Settlement Class; (3) approve the proposed class notice and forms; (4) set appropriate deadlines; and (5) schedule a final approval hearing.

Respectfully submitted,

Dated:  March 28, 2018                    By: /s/ *Jahan C. Sagafi*
                                                Jahan C. Sagafi

                                          Jahan C. Sagafi (Cal. Bar No. 224887)
                                          jsagafi@outtengolden.com
                                          OUTTEN & GOLDEN LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Relic Sun (Cal. Bar No. 306701)
rsun@outtengolden.com
OUTTEN & GOLDEN LLP
One Embarcadero Center, 38th Floor
San Francisco, CA 94111
Telephone: (415) 638-8800
Facsimile:  (415) 638-8810

Rachel Bien (Cal. Bar No. 315886)
rmb@outtengolden.com
Michael J. Scimone (admitted *pro hac vice*)
mscimone@outtengolden.com
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile:  (646) 509-2060

*Attorneys for Plaintiffs and Proposed Class
Members*

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION
SETTLEMENT, NO. 16-cv-02558-VC